UNITED STATES of America

v.

Vincent GIGANTE, Defendant.

No. CR 93–368(JBW).

United States District Court,
E.D. New York.

Oct. 29, 1997.

Zachary W. Carter, U.S. Atty., Eastern District of New York, Brooklyn, NY by Andrew Weissmann, George A. Stamboulidis, Daniel S. Dorsky, for the U.S.

Culleton, Marinaccio & Foglia, White Plains, NY by James J. Culleton, Michael A. Marinaccio, Philip Foglia; Steven R. Kartagener, New York City, for Defendant.

## MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge.

I. Introduction ........................................................ 145

II. Facts .............................................................. 145
 A. Commission Trial ............................................. 145
 B. 1990 Windows Trial .......................................... 146
 C. Competency .................................................. 146
 1. Competency Hearing and Proceedings Before Judge Nickerson ....... 146
 2. Competency Rehearing ...................................... 147
 D. Continued Defense Attempts to Delay Trial .................... 148
 E. 1993 Indictment ............................................. 148
 1. Charts Outlining 1990 "Windows" Indictment ............... 149
 a. 1990 Counts ........................................ 149
 b. 1990 RICO Predicate Acts ........................... 149
 2. Charts Outlining 1993 Superseding Indictment ............. 149
 a. 1993 Counts ........................................ 149
 b. 1993 RICO Predicate Acts ........................... 149
 F. Government Dismissal of 1990 Indictment ..................... 150
 G. Pre–Verdict Statute of Limitations Claims by Defense ........ 150
 H. Trial and Evidence Presented ................................ 150
 I. Jury Verdict ................................................ 153
 1. Items Upon Which the Jury Agreed ......................... 153
 a. Items Proven ....................................... 153
 b. Items Not Proven ................................... 153
 2. Items Upon Which Jury Could Not Agree .................... 153
 J. Remand Pursuant to 18 U.S.C. § 3143 ........................ 154
 K. Post–Verdict Defense Motions ................................ 154

III. Statute of Limitations Issues ..................................... 154
 A. Law ......................................................... 154
 1. Basic rules ............................................... 154
 2. Statute of Limitations and Superseding Indictments ....... 155
 3. Analogy to Double Jeopardy Law ........................... 157
 B. Application of Law to Facts ................................. 158
 1. Post–Verdict Statute of Limitations Claims—Charges Dismissed ....... 158
 2. Pre–Verdict Statute of Limitations Claims—Charges Remaining ....... 159
 a. Count One .......................................... 159
 (1) Predicate Act Nine ........................... 159
 (2) Predicate Act Ten ............................ 159
 (3) Predicate Acts Eleven through Thirty–Three ... 159
 (4) Predicate Acts Thirty–Four through Thirty–Nine ... 163
 (5) Predicate Act Forty .......................... 163
 (6) Predicate Act Forty–One ...................... 163
 b. Count Two .......................................... 164
 c. Count Three ........................................ 164
 d. Count Five ......................................... 164
 e. Count Six .......................................... 164
 3. Charges Upon Which Jury Could Not Agree .................. 165

IV. Competency Issues .................................................. 166

 A. Competency and Standing Trial.........................................166
 B. Competency and Withdrawing from a Conspiracy .........................168
 1. Law ................................................................168
 2. Application of Law to Facts......................................173
 a. Relevant Facts ...........................................173
 b. Jury Charge Offered .....................................173
 c. Rejection of Proposed Withdrawal Charge .................173
 d. Effect of Failure to Accept Proposed Charge .............173
 C. Competency and Sentencing...........................................173
 D. New Evidence and Incompetency Claims................................175
 1. Relevant Facts....................................................175
 2. Law .............................................................176
 3. Application of Laws to Facts......................................176

V. Conclusion ...............................................................177

Exhibit A: Completed Jury Verdict Sheet .......................................177

## I. Introduction

Found guilty by jury of racketeering (RICO), 18 U.S.C. § 1962(c), racketeering conspiracy, 18 U.S.C. § 1962(d), extortion conspiracy, 18 U.S.C. § 1951(a), labor payoff conspiracy, 18 U.S.C. § 371, and two counts of conspiring to murder in aid of racketeering, 18 U.S.C. § 1959(a)(5), defendant moves for: (1) dismissal of count four of the indictment; (2) a de novo determination of defendant's competency to participate in his criminal proceedings, tantamount to a motion for new trial based upon purported "new" evidence; and (3) any other relief to which he may be entitled. Defendant's motion is denied except that (1) count four of the indictment is dismissed on statute of limitations grounds and (2) a mistrial is granted as to RICO predicate acts two through five.

## II. Facts

The defendant was raised in a decent family. He became a thug in his teens, quickly moving into leadership of the Genovese Crime Family by the 1980's and control of a Commission of mob leaders coordinating mafia activities in the Northeast of the United States. He and his allies and subordinates dominated many industries and unions including those in the building trades such as windows, concrete, trucking; and trades associated with garbage collecting, painting, and conventions. With the assistance of corrupt union and business leaders and other gangland associates, the defendant earned millions of dollars from these activities as well as from loansharking, hijacking, gambling, and other criminal conduct.

### A. Commission Trial

By appointing street bosses to hide behind, and feigning mental incapacity, the defendant avoided prosecution for his crimes while other gang leaders were tried and sent to prison.

In the mid–1980's, for example, there was a government crack down on organized crime in New York. Several heads of New York's crime families were prosecuted. *See, e.g., United States v. Salerno*, 868 F.2d 524, 528 (2d Cir.), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989); *United States v. Langella*, 804 F.2d 185, 186 (2d Cir.1986); *see also, President's Commission on Organized Crime, Interim Report to the President and Attorney General, The Cash Connection: Organized Crime, Financial Institutions, and Money Laundering* 31–32 (Oct. 1984)(federal investigation of money laundering scheme known as "The Pizza Connection"). Among those brought to trial was Genovese Crime Family street-boss Anthony "Fat Tony" Salerno. He, with several of his mafia cohorts, was indicted, found guilty, and sentenced to a term of one-hundred years imprisonment. *See United States v. Salerno*, 868 F.2d 524, 528 (2d Cir.), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989). In fact, the evidence at the instant trial demonstrated that Mr. Salerno, while a guilty criminal, was probably acting under the directions of defendant Gigante.

**146**

### B. 1990 Windows Trial

On May 30, 1990, Mr. Gigante, along with fourteen others, was charged in a sixty-nine count indictment with illegally attempting to control New York's window manufacture and installation industry through criminal racketeering, money laundering, extortion, mail fraud, and other improper acts. *See, e.g., United States v. McGowan,* 58 F.3d 8, 10 (2d Cir.1995). Of the sixty-nine counts in the "windows" indictment, defendant himself was charged in thirty-five.

The indictment alleged a racketeering "enterprise" that was expansive, involving many crime family and non-crime family participants. One-hundred nine predicate acts were charged in support of the RICO counts. Defendant, it was alleged, took part in only some of these activities. As is often the case in racketeering prosecutions, many of the charged predicate racketeering acts mirrored the individual substantive counts in the indictment. *See, e.g., United States v. Ruggiero,* 726 F.2d 913, 923 (2d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984).

### C. Competency

Immediately after filing of the 1990 indictment, defendant claimed he was incompetent to stand trial. As proof he relied in part on the fact that, starting in October of 1966, though prior records indicated no evidence of mental illness, defendant had begun a sporadic regime of psychiatric treatment. He would periodically check into psychiatric hospitals for intervals of a few days. Given the questions raised by this history and the representations made by defendant's attorneys, Judge Raymond J. Dearie ordered a competency examination of Mr. Gigante under Section 4241(b) of Title 18 of the United States Code. Two psychiatrists were appointed by the court to assess the defendant's mental health. The defense also had two psychiatrists examine the defendant.

Based upon the information then available to them, all four experts concluded that defendant was not competent to be tried. The government urged the court to take into account information not available to the experts, that is, the defendant's private behavior and his activities as boss of the Genovese Crime Family. Judge Dearie reserved ruling on the issue so that more information could be presented.

Assessment of defendant's competency prevented his going forward to trial with his co-defendants. His case was severed and thereafter transferred to Judge Eugene H. Nickerson. The other co-defendants, with the exception of one who was murdered, and two others who absconded for a period of time, proceeded to trial. By late 1991 they were convicted or had pleaded guilty.

### 1. Competency Hearing and Proceedings Before Judge Nickerson

Extensive hearings on the issue of defendant's competency were held by Judge Nickerson. Testimony of defense experts, doctors appointed by the court, and lay witnesses who knew the defendant and were familiar with his private-life, was considered. At the close of the hearings, defendant was found to have continuously feigned mental illness. He was ruled physically and mentally competent to be tried. *United States v. Gigante,* 1996 WL 497050 (E.D.N.Y. August 28, 1996). Trial was set for March 17, 1997.

In early 1997, defendant underwent open heart surgery. To allow adequate time for rehabilitation the trial was postponed at his request until April 14, 1997. Prior to April 14, defendant moved for another adjournment because of his alleged continued ill health. The court granted the continuance, setting the case for trial on June 23, 1997, warning that no further continuances would be granted absent a showing of new circumstances.

In spite of the court's rulings, the defense again sought a postponement of trial based upon Mr. Gigante's alleged incompetence. Claiming that the defendant now appeared to be suffering from a new affliction—Alzheimer's disease—in addition to his other purported ailments, the defense made a further request that the trial be delayed. Judge Nickerson recused himself. The case was transferred to the undersigned on May 13, 1997.

## 2. Competency Rehearing

Defendant submitted further information regarding his purported mental deficiency and physical problems. The only important new evidence was testimony of expert defense witnesses who had performed a series of experimental tests upon the defendant.

One of these tests was a Positron Emission Tomographic (PET) scan of the defendant's brain. PET scans are tools fairly new to science. They are radiographic images created by "computer analysis of photons detected from annihilation of positrons emitted by radionucldes [sic] incorporated into biochemical substances" and show the distribution of certain substances in a patient's tissues. Stedman's Medical Dictionary 1820 (26th ed.1995). Here, the procedure was used to measure defendant's brain metabolism and activity while he attempted to respond to questioning by a physician conducting the test. A radioactive sugar compound—fluorodeoxyglucose—was injected into defendant's body. After a period of time, the compound made its way to defendant's brain. From photograph-like cross-sectional images depicting the fluorodeoxyglucose in the various parts of Gigante's brain, a defense expert claimed he could measure where and how much brain activity occurred.

Defense witness Professor Monte S. Buchsbaum of Mount Sinai School of Medicine interpreted the PET scans. According to Professor Buchsbaum's interpretation, defendant was suffering from organic brain dysfunction, possibly due to Alzheimer's disease or multi-infarct dementia. He could not pinpoint the cause of the abnormality; nor could he quantify its level. Whatever the specific problem and etiology, he claimed it rendered defendant incapable of being tried.

A second defense witness, Dr. Wilfred G. Van Gorp of New York Hospital's Cornell Medical Center, explained that he put defendant Gigante through a battery of interactive, neuropsychological tests, including the Portland Digit Recognition Test, the Warrington Face Recognition Test, the Warrington Word Recognition Test, and the Rey 15-Word Test, that were designed to ascertain whether defendant was malingering. Dr. Van Gorp testified that, based upon this series of examinations and their results, he concluded that defendant was not feigning incapacity, but in fact suffered from severe cognitive impairment.

Neither Professor Buchsbaum nor Dr. Van Gorp ever analyzed the defendant's blood to determine the amount of medication in his system at the time the tests were administered. Mr. Gigante was taking Thorazine, Restoril, Lanoxin, Teneormin, Pamelor, Dalmane and other drugs at the time of the examinations. He had been taken potent psychotropic medications for a long period.

Government witness, Jonathan Brodie, M.D., Ph.D., specializing in psychiatry, physiological chemistry, and neuroimaging at New York University Medical School, testified that the results of Dr. Van Gorp's neuropsychological tests could have been corrupted by the medications; they effect cognitive skills necessary to evaluate Dr. Van Gorp's tests. The defense produced no convincing testimony about the specific effect drugs taken by defendant had upon PET scans. From the limited information presented, there was no way to tell if, or how much, the results of the tests were skewed by the defendant's medication.

Defense experts' findings were, in any event, dubious, based upon speculative scientific theories lacking full development, research, and support. For instance, Professor Buchsbaum offered his opinion without having reviewed or compared any earlier PET scans of the defendant's brain; the alleged "dysfunction" as seen in the PET scans may have benignly existed in Mr. Gigante when he was an active criminal. In addition, defendant's PET scans were compared to those of a small group of people in order to ascertain if his brain was functioning "normally." This "control" group apparently was not selected at random; most of its members grossly differed from defendant in age and background. None, apparently, were under the influence of drugs.

Dr. Van Gorp's findings, too, were based upon speculative assumptions. For instance, he argued that since defendant seemed to be "trying" on the cognitive tests and scored

slightly above the score of "chance" (that is, the score one might achieve by simply guessing), the conclusion was valid that malingering was not probable.

None of the defendant's experts took into account the extensive testimony received by Judge Nickerson proving that defendant's mental difficulties had been feigned for many years. *See United States v. Gigante*, 1996 WL 497050, at *6 (E.D.N.Y. Aug.28, 1997)("... Gigante deliberately feigned mental illness from the late 1960's until at least September of 1991. As he has presented no convincing reason for the court to conclude otherwise, the court finds that the symptoms that Gigante has demonstrated since that time are also the product of malingering.").

The opinions of defendant's experts were unreliable. They were not consistent with other evidence in the case. Assuming for the sake of this memorandum that their opinions met the *Daubert* test, they were not credible and were unpersuasive. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); John F. Fielder, *Daubert Can Undermine Psychiatric Testimony*, Nat. L. J., Sept. 22, 1997, at B14–15. *Daubert* provides a rule of admissibility, not one of mandatory probative force. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–95, 113 S.Ct. 2786, 2796–97, 125 L.Ed.2d 469 (1993).

The defense failed to meet its burden of proving defendant incompetent. The parties were ordered to commence the trial on June 23, 1997, the date set by Judge Nickerson.

### D. Continued Defense Attempts to Delay Trial

Defendant's tactics of delay did not end with the repeated determination of his competence. On June 13, 1997 the defense sought another adjournment, based upon purported pre-trial publicity, which it argued had the potential to impact the impartiality of the jury. After a hearing, the motion was denied.

Three days later, on June 16, the defense again moved for a continuance. Claiming that defendant had a new set of physical problems—potentially cancerous nodules on his thyroid, protrusion of his pacemaker, blood in his urine, and required dental care— the defense asked for jury selection to begin as scheduled, but for postponement of the trial until it could obtain further diagnoses from assorted medical professionals. After a hearing, the motion was denied.

The trial proceeded as scheduled. Defendant's physician remained in attendance throughout the trial. Continuances and recesses were granted whenever requested by defendant's physician.

### E. 1993 Indictment

As already noted, *see supra* section II(C), the case against Mr. Gigante had been severed from that of the other defendants in the 1990 "windows" prosecution. The 1990 indictment remained pending throughout defendant's competency proceedings.

The government filed a superseding indictment against Mr. Gigante on June 10, 1993. The new indictment covered less ground than the 1990 indictment. The most obvious differences were that it consisted of many fewer counts (six) and charged only one defendant (Vincent Gigante). It did add charges of conspiracy to murder persons involved in organized crime, including leaders in the Gambino Crime Family, Gene Gotti and John Gotti, as well as Peter Savino, a long-time member of the Genovese Family.

The new indictment, like the old, also alleged that Gigante was involved in racketeering and conspiring to racketeer. While in the 1990 indictment the racketeering "enterprise" was expansive, including members of four New York City crime families and union representatives, the racketeering "enterprise" alleged in the 1993 indictment was less far reaching, characterizing the enterprise simply as the Genovese Crime Family.

In support of the racketeering and racketeering conspiracy counts in the new indictment, the government alleged forty-one predicate acts. As with the 1990 indictment, many of the predicate acts charged covered the same conduct charged in the substantive counts. More significantly, many of the counts and relevant predicate acts of the 1993 indictment included the same conduct

charged in the 1990 "windows" indictment. An outline of the substantive charges and predicate racketeering acts of each relating to defendant Gigante is listed below. · For sake of clarity and comparison, some of the charges have been grouped and the dates pertaining to the allegations have been provided by way of range:

### 1. Charts Outlining 1990 "Windows" Indictment

#### a. 1990 Counts

| COUNT | OFFENSES CHARGED | DATES CHARGED |
| --- | --- | --- |
| Count 1 | Racketeering conspiracy | Between 1/1/78 and filing of indictment |
| Count 2 | Racketeering | Various (see relevant predicate acts below) |
| Count 3 | Extortion conspiracy· | Between 1/1/78 and filing of indictment |
| Count 4 | Labor payoff conspiracy | Between 1/1/78 and filing of indictment |
| Count 5 | Mail fraud conspiracy | Between 1/1/78 and filing of indictment |
| Counts 9–11 | Labor payoffs | Various (ranging from 3/15/84 to 2/4/86) |
| Counts 35–57 | Labor payoffs | Various (ranging from 4/10/87 to 1/20/88) |
| Count 58 | Extortion | Between 3/85 and 4/87 |
| Count 60 | Extortion | Between 1984 and filing of indictment |
| Count 61 · | Extortion | In or about 7/85 |
| Count 68 | Mail fraud | Various (ranging from 6/28/84 to 7/24/85) |

#### b. 1990 RICO Predicate Acts

| PREDICATE | OFFENSES CHARGED | DATES CHARGED |
| --- | --- | --- |
| Acts 12–18 | Labor Payoffs | Various (ranging from 3/15/84 to 2/4/86) |
| Acts 55–77 | Labor Payoffs | Various (ranging from 4/10/87 to 1/20/88) |
| Act·78 | Labor Payoffs | On or about 2/10/89 |
| Act 80 | Labor Payoff | On or about 2/22/89 |
| Act 83 | Extortion | Between 3/85 and 4/87 |
| Act 85 | Extortion | Between 1984 and filing of the indictment |
| Act 86 | Extortion | Between 8/83 and 5/84 |
| Act 87 | Extortion | In or about 7/85 |
| Acts 99–107 | Mail Fraud | Various (ranging from 6/28/84 and 7/24/85) |

### 2. Charts Outlining 1993 Superseding Indictment

#### a. 1993 Counts

| COUNT | OFFENSES CHARGED | DATES CHARGED |
| --- | --- | --- |
| Count 1 | Racketeering | Various (see relevant predicate acts below) |
| Count 2 | Racketeering Conspiracy | From 1/78 until filing of the indictment |
| Count 3 | Murder Conspiracy | Between 6/89 and filing of indictment |
| Count 4 | Murder Conspiracy | From Summer 1988 and 10/26/88 |
| Count 5 | Extortion Conspiracy | Between 1/78 and 1989 |
| Count 6 | Labor Payoff Conspiracy | Between 1/78 and 1989 |

#### b. 1993 RICO Predicate Acts

| PREDICATE | OFFENSES CHARGED | DATES CHARGED |
| --- | --- | --- |
| Acts 1–8 | Murders and Murder Conspiracies | Various (ranging from 1980 to 1983) |
| Act 9 | Murder Conspiracy | Between 6/89 and filing of indictment |

| Act 10 | Murder Conspiracy | Between "early" 1986 and 1991 |
|---|---|---|
| Acts 11–33 | Labor Payoffs | Various (ranging from 4/10/87 to 1/20/88) |
| Acts 34–39 | Labor Payoffs | Various (ranging from 1/7/88 to 6/7/88) |
| Act 40 | Labor Payoff | 6/27/88 |
| Act 41 | Extortion Conspiracy | Between 1/1/78 and 12/31/89 |

### F. Government Dismissal of 1990 Indictment

By the time defendant's pretrial competency was determined, several years had passed since the filing of the original 1990 "windows" indictment. Dealing with both the old and new indictments at trial would have been difficult, time consuming, and potentially confusing to the jury. Nevertheless, the government could have proceeded to trial on both sets of charges. After considering its options, and with the consent of the defense, the government announced dismissal of the 1990 indictment, choosing to go to trial on the 1993 indictment alone.

In moving to dismiss the "windows" indictment, the government did not ignore its allegations. It sought the benefit of the statute of limitations cut-off date applicable to the old indictment wherever permissible. Asserting that many of the 1990 charges were merely repleaded in the 1993 indictment, it claimed the earlier charges and their tolling of the statute of limitations should "carry-over" to the to the 1993 prosecution.

### G. Pre–Verdict Statute of Limitations Claims by Defense

During trial, the defense objected to relation-back to the 1990 charging instrument. It insisted that, on their face, many of the charges in the 1993 indictment fell outside the five-year statute of limitations period preceding its filing. It argued that the two documents were so different that relation-back was precluded. The defense arguments were critical with respect to two sets of allegations—those relating to the labor payoff scheme and to conspiracy to extort.

The defense pointed out that the alleged labor payoffs charged in the 1993 indictment both as predicate acts in support of the RICO counts, and substantively as count six, were charged under a different subsection of law than the related charges in the 1990 indictment. Thus, they urged, no carry-over for statute of limitations purposes could be permitted. Defendant also challenged relation-back for the predicate acts because the labor payoff scheme charged in 1990 was pleaded as a substantive count and not a RICO predicate act.

As to the extortion conspiracy charges, set forth both as racketeering predicate acts and as a substantive count in the 1993 indictment, the defense claimed they had been pled much more broadly in the 1990 indictment than in the more recent one. Because, according to the defense, the 1990 allegations covered a larger agreement than that contemplated by the 1993 allegations, no relation-back to the earlier charging document could be permitted.

A decision on statute of limitations issues was held in abeyance pending trial. As was conceded by the parties, the statute of limitations questions posed might be rendered moot depending upon the evidence and findings by the jury, given the nature of racketeering and conspiracy allegations.

### H. Trial and Evidence Presented

The jury selection process was fashioned to avoid any apprehension of threats to the jurors. Jurors were anonymous and partially sequestered; names of the prospective jurors were shared only with the attorneys. *See United States v. Barnes*, 604 F.2d 121, 141 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980)(use of anonymous jury to protect the jurors and their impartiality); *see also* Nancy Gertner and Judith H. Mizner, *The Law of Juries*, 10–15 ("[t]he issue of juror anonymity has been raised most frequently during organized crime prosecutions in the Second Circuit"). Potential jurors were required to complete questionnaires listing background and personal information. The questionnaires, along with the oral *voir dire* provided

the parties with a fair sense of the potential biases and beliefs of the prospective factfinders. The jurors were at all. times relaxed, fully engaged in the trial, apparently convivial in their enjoyment of one another's company and extremely serious in carrying out their duties. Each juror took extensive notes. Their requests during deliberations showed a complete grasp of the law and the evidence. Their findings were precise and in agreement with the court's private analysis.

Defendant, who previously had claimed to have been too ill to attend pre-trial hearings, was present throughout the jury selection process and subsequent trial. Both defense and government counsel tried the case with great skill, exercising the highest professional standards. Based on the evidence, the court did not credit the defense that counsel could not confer effectively with defendant during trial.

At trial, the government presented eighteen witnesses. Well over two hundred-fifty exhibits, including surveillance photographs, tape-recordings of conversations of defendant's co-conspirators, as well as many pages of documents and transcripts were admitted.

The evidence relating to Mr. Gigante's alleged illegal conduct in participating in murders prior to the mid–1980's was not strong. By contrast, the evidence regarding his later conduct demonstrated without a reasonable doubt that Mr. Gigante had been the boss of the Genovese Crime Family since at least 1985 and that he was guilty of the crimes and predicate acts of which the jury found him guilty from that date forward.

Testimony from former fellow organized crime members implicated defendant in the charged racketeering acts and conspiracies. Lucchese associate Peter Chiodo, former acting boss of the Lucchese Family, Alphonse D'Arco, and former Gambino Family underboss, Salvatore "Sammy the Bull" Gravano, along with others associated with the mobs described the power held by Gigante and his deep involvement in the world of organized crime. Their testimony was based upon their personal dealings with defendant and his co-conspirators. These witnesses explained that the Genovese Crime Family, prior to and during Gigante's tenure, engaged in extensive illegal money-making activities. According to them, the Genovese Family had a hand in controlling legitimate economic entities, including the Fulton Fish Market, garment district companies, night clubs and casinos, and the concrete and windows industry. None of these activities occurred, they explained, without the permission of the boss, the defendant.

According to the former mafia member witnesses, the Genovese Family involved itself in the windows industry during the 1980's by way of an arrangement referred to as the "windows club." Window replacement companies run by Genovese Family members or associates made payments to the Lucchese Family and others who influenced local union decisions to permit cheaper non-union laborers to install windows. Genovese members obtained window replacement contracts for jobs with the New York City Housing Authority and other organizations that should have been handled by companies using union employees only. Bid-rigging, bribes, and extortion assured the extremely high profits shared with defendant. Mr. Gigante was responsible for all of these criminal dealings, consenting to, assisting in, and benefitting from the illegal activities of these Genovese-run entities and cooperating mafia gangs.

Testimony also demonstrated defendant's participation in several murder conspiracies. Among them was the conspiracy to murder John and Gene Gotti of the Gambino Family. During the 1980's, the Gambino Crime Family boss, Paul Castellano, was killed. His murder had not been approved by the Commission made up of the leaders of each mafia family—a breach of one of the gangs' cardinal rules. Testimony revealed that Mr. Gigante and other Commission members agreed that those who murdered Castellano had to be hunted down and killed as punishment for the unsanctioned murder. When it was learned that the Gotti brothers, with the help of Gravano, were responsible for Castellano's death, arrangements were made by Mr. Gigante and the rest of the Commission to kill John and Gene Gotti. The first plan was not carried out because agents of the Federal Bureau of Investigation, after learning about the plot by way of clandestine tape-

recording, warned the would-be victims. The second plan, a bombing to be facilitated by D'Arco, did not occur because the Gotti brothers were arrested.

The evidence clearly demonstrated that defendant was also a leader in the conspiracy to murder Peter Savino, a former associate of the Genovese Family. Savino, who is now in the federal witness protection program, testified at trial by way of two-way closed circuit television. *See United States v. Gigante,* 971 F.Supp. 755 (E.D.N.Y., July 21, 1997)(television testimony permitted under the special circumstances of this case and because of the witness' life-threatening illness). Savino had been ordered killed by Mr. Gigante because he had become a government informant.

Revealed beyond doubt were the great lengths to which defendant went to appear incompetent in order to avoid detection and prosecution. For instance, throughout the 1970's and 1980's Mr. Gigante began checking into mental institutions for short visits, what other members of the gangs referred to as "tune-ups." Defendant did this even though it was clear that he was capable mentally.

Law enforcement witnesses who had watched Mr. Gigante on the street, in his club, and at his home, reported that he changed his behavior depending upon whether or not he was in public, or believed he was being watched. Testimony indicated that out in the street he often wore an old bathrobe, shuffled about in slippers, and stared off into the distance mumbling to himself. Meanwhile, when defendant thought he was "behind closed doors" he was observed as savvy, interacting normally with natural family members, friends, and criminal associates, perusing ledger books, playing cards, talking on the telephone, ordering about members of his mob and criminal associates, and taking part in Commission meetings. He demonstrated normal and detailed concerns for those he loved, such as by planning for his daughter to be admitted to the college of her choice and by expressing concern about whether his paramour was following their doctor's orders. He exercised meticulous and detailed control of the day-to-day operations of a huge criminal enterprise. Required was the ability and intellectual capacity equivalent to that of the Executive Officer of a large conglomerate corporation.

There was overwhelming evidence that Mr. Gigante feared being overheard or having his name repeated on government wire-taps and "bugs" and that he took extraordinary steps to prevent this from happening. To limit the chance of being recorded he directed that the Commission stop meeting to discuss ordinary business—such as details of the control of the windows or construction industry—but gather only sparingly for critical matters to limit the chance of being recorded. In order to keep defendant's name from government tape-recordings, Mr. Gigante announced his edict: speaking Vincent Gigante's name aloud would be enough to get a person killed. Those who needed to refer to defendant in conversation pointed to their chin or used a sobriquet such as "the robe" or "my aunt." Illustrative of defendant's techniques, Peter Savino testified that on one occasion he was taken into the men's toilet by defendant to talk about the "windows club" scheme. Mr. Gigante walked into the men's room, turned the water on in the sink "full blast" to create noise, and then whispered into Savino's ear. He shrewdly questioned Savino about details of the "windows club" operations. While obviously coherent during the conversation, according to Savino, the tone changed at the end; Defendant instructed Savino to tell others that he, Mr. Gigante, was crazy.

Typically, defendant telephoned from public phones chosen at random after 11:00 p.m. He was chauffeured about the city when he was not presiding at this hangouts. Mr. Gigante was, and acted the role of, a criminal lord. But, unlike some other criminal leaders, he carefully covered his tracks with great skill.

The defense presented no evidence except for a few documents of little significance. Defendant's attorneys did not attempt to demonstrate defendant's incompetence except by having him sit impassively in a wheelchair in the courtroom, ostensibly oblivious to all that went on. Consistent with the claim that he was incompetent, they took pains never to consult with him in public.

## I. Jury Verdict

It was apparent throughout the trial that the jury listened closely to the testimony and carefully scrutinized the evidence. As already indicated, extensive notes were taken by all jurors after being instructed on the advantages and disadvantages of note-taking. Questions from the jury room during deliberations displayed thoughtfulness and diligence; the jurors carefully and methodically worked their way through the detailed verdict sheet.

Special jury verdict questionnaires, such as the one in this case, that allow jurors to "record their specific dispositions of the separate predicate acts charged, in addition to their verdict of guilt or innocence on the RICO" charges, are an important tools in administering complex criminal RICO cases. *United States v. Ruggiero*, 726 F.2d 913, 922–23 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). On the verdict sheet the jury was required to list whether, as to each count, they found the defendant guilty or not guilty. For the predicate acts they were instructed to make a finding of proven or not proven. As to any act charged either as a separate count or a predicate act that was conspiratorial in nature, the jury was required to determine when, if at all, the conspiracy ended. A copy of the verdict sheet presented to the jurors in this case with the jurors' answers is set forth at the end of this opinion as Appendix A.

After deliberating for several days, the jury returned its verdict, was polled, and was dismissed. There was no objection from either side. The court instructed the jurors that they were free to discuss the case but that the court recommended that they do not. As they were each day at the trial, they were chauffeured from the court garage to their homes, where, having done their duty, like Cincinnatus of old, they quietly retired to their well-earned privacy.

### 1. Items Upon Which the Jury Agreed

#### a. Items Proven

The jury concluded that defendant was guilty of all six of the counts in the 1993 indictment. As required, it also made special findings regarding the dates until which the conspiracies lasted. For the racketeering conspiracy count it found that the conspiracy lasted until June, 1993; for the count relating to the conspiracy to murder Peter Savino it found that it lasted until July, 1991; for the count relating to the conspiracy to murder the Gotti brothers it found that the conspiracy lasted until January, 1988; for the windows industry extortion conspiracy count it found that it lasted until June, 1989; and for the labor payoff conspiracy count it found that the conspiracy lasted until June, 1988.

As to the forty-one predicate racketeering acts in support of the substantive racketeering count, the jury found that the government proved thirty-two. These were predicate acts nine, ten, eleven through thirty-three, thirty-four through thirty-nine, forty and forty-one. Since some of these predicate acts were conspiracies, the jury was also required to make findings as to the ending dates for each of them. For predicate act nine, the conspiracy to murder Peter Savino, it found that the conspiracy lasted until July, 1991; for predicate act ten, the conspiracy to murder John Gotti and others, it found that the conspiracy lasted until January, 1988; as to predicate act forty-one, the extortion conspiracy, it found that the conspiracy lasted until June, 1989.

#### b. Items Not Proven

The jury agreed that the government failed to prove predicate racketeering acts one, six, seven, and eight relating to the murders in the early 1980's of Jerry Pappa, Frank Narducci, Rocco Marinucci, and Enrico Carini.

### 2. Items Upon Which Jury Could Not Agree

The remaining racketeering predicate acts, numbers two through five alleged in support of counts one and two, charged defendant with taking part in conspiracies to murder Anthony Caponigro, Fred Salerno, John "Keys" Simone, and Frank Sindone. These persons allegedly killed Angelo Bruno, the Boss of the Philadelphia Crime Family, without seeking permission from the Commission. The jury was not able to agree upon whether the government proved the charges. With-

out objection, the court and the parties agreed to dismiss the jury despite non-agreement as to these charges. Thus, there was a mistrial on these predicate acts. Fed. R.Crim.P. 26.3; *see also Oregon v. Kennedy,* 456 U.S. 667, 672–673, 102 S.Ct. 2083, 2087–2088, 72 L.Ed.2d 416 (1982); *United States v. Huang,* 960 F.2d 1128, 1135 (2d Cir.1992).

### J. Remand Pursuant to 18 U.S.C. § 3143

Upon the return of the verdict, pursuant to Section 3143 of Title 18 of the United States Code, defendant was remanded to the custody of the Attorney General to await sentencing. He was permitted to self-surrender within twenty-four hours of the order of the court to the Federal Correctional Institution in Butner, North Carolina, out of a sense of humanity, to allow defendant time to be alone with his family prior to sentencing.

While at the facility in Butner, defendant was examined over an extended period by the psychiatric and medical staff pursuant to Section 4244(b) of Title 18 of the United States Code. On September 16, 1997, a Forensic Evaluation (Report) containing the findings of Staff Psychiatrist, Peter N. Barboriak, M.D., Ph.D., and Staff Clinical Psychologist, Mark Hazelrigg, Ph.D., of the Mental Health Division of the Federal Correctional Institution was delivered to the court and the parties.

The report reflected and summarized the procedures that were administered during the assessment period, the staff's interactions with defendant, background information about Mr. Gigante, including his mental health history, defendant's own behavior while at the facility and, finally, the Butner staff's psychological assessment of defendant. Malingering, Hypnotic (Benzodiazepine) Dependence, Possible Psychotic Disorder, and Dementia Not Otherwise Specified (Provisional), as well as Antisocial Personality Disorder was the tentative diagnosis.

### K. Post–Verdict Defense Motions

In addition to the claims raised by the defense during trial regarding alleged statute of limitations violations, the defendant moved post-trial for dismissal of count four of the indictment on the basis of a statute of limita-

tions time bar, sought a *de novo* adjudication of the issue of defendant's competence at trial based upon alleged "new" evidence of mental illness contained in the Butner Report, and sought any additional relief to which he was entitled.

### III. Statute of Limitations Issues

#### A. Law

##### 1. Basic Rules

Statutes of limitations "limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of [criminal] acts." *Toussie v. United States,* 397 U.S. 112, 114–15, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970); *see also* William D. Ferguson, *The Statute of Limitations Saving Statutes* 7–59 (1978)(whether "the defendant received timely notice to enable him to secure and preserve evidence to meet the claim"). It is unjust to force defendants to answer "charges when the basic facts may have become obscured by the passage of time." *Toussie v. United States,* 397 U.S. 112, 114–15, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970).

A five year statute of limitations applies to federal non-capital crimes, unless specifically provided otherwise. *See* 18 U.S.C. § 3282. In order to avoid a Section 3282 bar, the government must file an indictment within five years of the conclusion of a criminal act. The issue of what constitutes the conclusion of a criminal act can provide difficulties, particularly in RICO and conspiracy cases.

For a finding of guilt in a RICO case it must be shown that a defendant committed or aided and abetted in at least two criminal predicate acts in a pattern of criminal activity in furtherance of a particular criminal enterprise. *See, e.g., United States v. Persico,* 832 F.2d 705, 714 (2d Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988). The predicate acts must relate temporally to one another, being separated by no more than ten years. 18 U.S.C. § 1961(5). Even though the predicate acts may be ten years apart, the general statute of limitations still applies to the last predicate act. Thus, in order to overcome a time bar, at least one of the predicate acts in

furtherance of the racketeering scheme must occur within five years of the filing of the charges. *See, e.g., United States v. Persico,* 832 F.2d 705, 714 (2d Cir.1987).

■ For conspiracies, the general rule is that the crime is concluded when the conspiracy has been abandoned or its purposes accomplished. *See, e.g., Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912); *United States v. Rastelli,* 870 F.2d 822, 832, 838–40 (2d Cir.), *cert. denied,* 493 U.S. 982, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989); *United States v. Persico,* 832 F.2d 705, 713 (2d Cir.1987). This rule applies in racketeering conspiracies. *See, e.g., United States v. Salerno,* 868 F.2d 524, 534 (2d Cir.), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989); Note, *When Will the Idling Statute of Limitations Start Running in RICO Conspiracy Cases?,* 10 Cardozo L. Rev. 2167 (1989).

### 2. Statute of Limitations and Superseding Indictments

■ The statute of limitations issue becomes more complex when the government files more than one indictment against a criminal defendant. There is no statute approving the common practice of issuing superseding indictments. *See, e.g., United States v. Rojas–Contreras,* 474 U.S. 231, 237, 106 S.Ct. 555, 559, 88 L.Ed.2d 537 (1985)(J. Blackmun concurring)("the term 'superseding indictment' refers to a second indictment issued in the absence of a dismissal of the first"); *United States v. Lytle,* 677 F.Supp. 1370 (N.D.Ill.1988)("[d]espite the universal use of the 'superseding' label, no statutory recognition of the concept exists"). Superseding indictments are permitted so long as the filing of the subsequent indictment does not prejudice or harass a defendant. *See United States v. Grady,* 544 F.2d 598, 602 n. 4 (2d Cir.1976)("[t]wo indictments may be outstanding at the same time for the same offense if jeopardy has not attached to the first indictment," but "vindictive reindictment by a prosecutor may violate due process").

■ A subsequent indictment covering the same conduct as the first does not change the earlier indictment's tolling effect. *See, e.g., United States v. Panebianco,* 543 F.2d 447,

454 (2d Cir.1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977). So long as a superseding indictment contains charges that are not substantially broader than those in a superseded indictment, the earlier statute of limitations cut-off date of the superseded indictment applies to the superseder. *See, e.g., United States v. Panebianco,* 543 F.2d 447, 454 (2d Cir.1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977); *United States v. Grady,* 544 F.2d 598, 602 (2d Cir.1976). As one court put it: "the superseding indictment relates back to the filing date of the original indictment so long as a strong chain of continuity links the earlier and later charges." *United States v. O'Bryant,* 998 F.2d 21, 24 (1st Cir.1993).

Relating-back comports with the rule that a defendant must be given fair and timely notice of the charges against him. *See United States v. Gengo,* 808 F.2d 1, 3 (2d Cir.1986)("notice is the touchstone in deciding whether a superseding indictment substantially changes the original charges"); *see also United States v. Italiano,* 894 F.2d 1280, 1283 (11th Cir.)(notice is the "central policy underlying the statutes of limitations"), *cert. denied,* 498 U.S. 896, 111 S.Ct. 246, 112 L.Ed.2d 205 (1990). The effect of notice is not reduced if the charges in both documents are substantially the same. *United States v. Davis,* 953 F.2d 1482, 1491 (10th Cir.), *cert. denied,* 504 U.S. 945, 112 S.Ct. 2286, 119 L.Ed.2d 210 (1992). Once adequate notice has been given in the first indictment, defendants know that they "will be called to account for their activities and should prepare a defense." *United States v. Grady,* 544 F.2d 598, 601 (2d Cir.1976). So long as nothing is done by way of multiple indictments to "draw the defendant's attention away from" the nature of the allegations against him, there is no reason not to allow relation-back. *United States v. O'Neill,* 463 F.Supp. 1205, 1207 (E.D.Pa.1979).

■ Ascertaining whether charges in a superseding indictment substantially broaden those in an earlier indictment, thereby vitiating the earlier notice, can be difficult. Required is a careful analysis, not only of the

statutes under which the defendant is charged, but of the actual language of the superseded and superseding charging documents. *See United States v. Italiano,* 894 F.2d at 1282 (11th Cir.1990)("For purposes of the statute of limitations, the 'charges' in the superseding indictment are defined not simply by the statute under which the defendant is indicted, but also by the factual allegations that the government relies on to show a violation of the statute."); *see also United States v. Castellano,* 610 F.Supp. 1359, 1381 (S.D.N.Y.1985)(complexity of indictment requires close individual scrutiny of each count in superseding indictment).

The court's experience and common sense are useful tools in the enterprise. Among the questions to be addressed are: Would a reasonable defendant be surprised by new allegations? Was it likely that the evidence would be substantially different or unavailable? Were the burdens of defense appreciably enhanced?

There are a wide range of cases where relation-back has been allowed. For instance, in *United States v. Panebianco,* 543 F.2d 447, 454 (2d Cir.1976), a superseded indictment tolled the statute of limitations for a superseding indictment even though the new indictment "added a few other defendants and some more overt acts" in furtherance of a conspiracy. Relation-back was also allowed in *United States v. Robilotto,* 828 F.2d 940, 949 (2d Cir.1987), when a superseding indictment made "minor technical changes" to a prior indictment and did not prejudice the defendant. In *United States v. Gengo,* 808 F.2d 1, 3–4 (2d Cir.1986), a new indictment correcting the time frame of an alleged income tax evasion conspiracy and adding "new objects of the conspiracy" did not substantially broaden the charges against the defendant. *United States v. Davis,* 953 F.2d 1482 (10th Cir.1992), held that "[a]n indictment is not amended impermissibly by a superseding indictment which names a greater or lesser number of defendants as coconspirators or contains a slightly different mix of closely related statutory violations as objects of the conspiracy, provided the essential nature of the conspiracy alleged in the first indictment remains the same." In *Unit-*

*ed States v. Sears, Roebuck & Co.,* 785 F.2d 777, 779 (9th Cir.), *cert. denied,* 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986), substitution in a superseding indictment of "the general false statement provision in 18 U.S.C. § 1001 for the more specific false statement provision in 18 U.S.C. § 542" was allowed as an appropriate notice-based carryover.

While such cases are instructive, none of them deal with the specific issues raised during trial by the defense in motions to dismiss. In addition, they do little to delineate the outer parameters of permissible ranges of modification. *Cf. United States v. Lytle,* 677 F.Supp. 1370, 1376 (N.D.Ill.1988)(while there are ample cases quoting the "substantial similarity" rule language, very few actually do more "than state their conclusions as to whether or not particular superseding indictments fit that description, without describing in sufficient detail the differences between the earlier and later indictments that underlie those conclusions").

The court of appeals for the Second Circuit has suggested that courts examine "cases dealing with variances between indictments issued by a grand jury and later amendments of indictments permitted by trial courts" when determining if a superseding indictment materially changes earlier charges. *United States v. Grady,* 544 F.2d 598, 602 (2d Cir.1976). The law permitting amendments to indictments may not be particularly useful in difficult statute of limitations cases. As was pointed out in *Grady,* amendments to indictments are only permitted for minor changes that are "trivial" or "innocuous." 544 F.2d 598, 602 (2d Cir.1976); *see also* 1 Charles Alan Wright, *Federal Practice and Procedure* § 127, at 419–421 (2d ed. 1982 & Supp.1997).

The test is different for statute of limitations issues: superseding indictments get the benefit of an earlier statute of limitations if they do not "substantially broaden" an earlier filed charge. There is substantial space between changes which are "trivial" and those that do not "substantially broaden." *See United States v. Lytle,* 677 F.Supp. 1370, 1376 n. 12 (N.D.Ill.1988)(criticizing the language of "trivial" and "innocuous" as it re-

lates to superseding indictments; such language should not be used to mark "the outer limits of the government's ability to change the factual allegations in a superseding indictment"); *see also United States v. Rojas–Contreras*, 474 U.S. 231, 240, 106 S.Ct. 555, 560, 88 L.Ed.2d 537 (1985)(J. Blackmun concurring)(a superseding indictment, as compared to a superseded indictment, may allege "additional charges" or make "material changes" affecting the type of defense be presented).

### 3. Analogy to Double Jeopardy Law

The law relating to the Fifth Amendment's Double Jeopardy Clause may provide a useful analogy. The Constitution's Double Jeopardy Clause protects against two major evils—second prosecution after acquittal or conviction, and multiple punishments for the same offense. *See North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). Not only is the government prohibited from twice imposing a penalty upon a defendant for the same crime, it may not retry a defendant on charges once the defendant has been tried and found guilty, or tried and acquitted. *See Ex Parte Lange*, 18 Wall. 163, 85 U.S. 163, 173, 21 L.Ed. 872 (1873)("[t]he Constitution was designed as much to prevent the criminal from being twice punished for the same offense as from being twice tried for it"); *cf. United States v. Ursery*, 518 U.S. 267, 116 S.Ct. 2135, 2149, 135 L.Ed.2d 549 (1996)(in rem civil forfeitures not criminal in nature for Double Jeopardy Clause); *see generally* Wayne R. LaFave and Jerold H. Israel, *Criminal Procedure* § 24.1, at 65–66 (1984). As in the case of relation-back of a superseding indictment, one of the purposes of the Double Jeopardy Clause is to protect against harassment and inconvenience to defendants of repeated threats of prosecutions. Determining when crimes constitute the "same offense" in double jeopardy and statute of limitations relation-back cases is useful in the solution in both categories of issues. *Cf. United States v. Rojas–Contreras*, 474 U.S. 231, 236–37, 106 S.Ct. 555, 558, 88 L.Ed.2d 537 (1985)(return of superseding indictment that differed from superseded indictment did not effect timetables under Speedy Trial Act's thirty day rule for commencement of

trial since defendant was not "prejudiced by the change").

The landmark double jeopardy decision is *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). It tells us whether two charges constitute the same offense, providing a double jeopardy bar. *See Rutledge v. United States*, 517 U.S. 292, ——, 116 S.Ct. 1241, 1245, 134 L.Ed.2d 419 (1996). *Blockburger* involved sales of narcotics under two statutes: one, selling without a written order and two, selling other than in the stamped package; prosecution under one statute did not preclude prosecution under the other. The *Blockburger* test is: "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)(discussed in context of double jeopardy punishment); *see also United States v. Dixon*, 509 U.S. 688, 697–700, 113 S.Ct. 2849, 2856–58, 125 L.Ed.2d 556 (1993)("same elements" of *Blockburger* test discussed in context of double jeopardy).

There was a period during which the Court strayed from *Blockburger*. It applied what has become known as the "same conduct" test. *See Grady v. Corbin*, 495 U.S. 508, 510, 110 S.Ct. 2084, 2090, 109 L.Ed.2d 548 (1990)(failure to reduce speed conviction barred involuntary manslaughter prosecution). Subsequent prosecution would be prohibited "if, to establish an essential element of an offense charged ... the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted." 495 U.S. 508, 510, 110 S.Ct. 2084, 2090, 109 L.Ed.2d 548 (1990). *Grady v. Corbin* was short-lived. It was overturned by *United States v. Dixon*, 509 U.S. 688, 704, 113 S.Ct. 2849, 2860, 125 L.Ed.2d 556 (1993)(possession of cocaine is a basis for criminal contempt and for the substantive offense of possession). *Corbin* was abandoned because it lacked precedential basis and, as applied, was deemed unworkable. *United States v. Dixon*, 509 U.S. 688, 709,

113 S.Ct. 2849, 2863, 125 L.Ed.2d 556 (1993); *see also Witte v. United States,* 515 U.S. 389, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995)(*Block-burger* test).

Comparison of elements for double jeopardy analysis becomes difficult in the context of modern, complex criminal cases. These situations do not easily lend themselves to *Blockburger*'s "same elements" test. More varied considerations must be taken into account when resolving double jeopardy questions in "multi-layered" prosecutions, particularly those involving conspiracy or RICO charges. *See United States v. Macchia,* 35 F.3d 662, 668 (2d Cir.1994)("no dominant factor or single touchstone"); *United States v. Russotti,* 717 F.2d 27, 33 (2d Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984)("*both* the enterprise and the pattern of activity alleged in the [earlier] indictment must be the same as those alleged in the [later] indictment")(emphasis in original).

■ For conspiracy cases in the Second Circuit, double jeopardy consideration involves assessment of eight factors: (1) the criminal offenses charged in successive indictment; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) existence of common overt acts; (6) the geographic scope of the activities; (7) the common objectives of the charged activities; and (8) the degree of interdependence between the conspiracies. *United States v. Korfant,* 771 F.2d 660, 662 (2d Cir.1985); *see also United States v. Macchia,* 35 F.3d 662, 667–72 (2d Cir.1994)(applying *Korfant).*

■ Under this Second Circuit approach in RICO cases, both the racketeering enterprise and the pattern of activity charged in the first indictment must be essentially the same as that set out in the second indictment for there to be a Fifth Amendment violation. *United States v. Russotti,* 717 F.2d 27, 33 (2d Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984); *see also United States v. Orena,* 876 F.Supp. 20, 23 (E.D.N.Y.1995). Similarity of enterprise is determined by the language of the charging instruments. The similarity of pattern of racketeering activity is not so easily determined. *Russotti* requires consideration of five factors in ascertaining whether the pattern of racketeering

activity is the same. *United States v. Russotti,* 717 F.2d 27, 33 (2d Cir.1983). These are: (1) the time of the various activities charged as parts of separate patterns; (2) the identity of persons involved in the activities; (3) the statutory offenses charged as racketeering activities in each charge; (4) the nature and scope of the activity the government seeks to punish under each charge; and (5) the places where the corrupt activities took place. *United States v. Russotti,* 717 F.2d 27, 33 (2d Cir.1983)(*citing United States v. Dean,* 647 F.2d 779 (8th Cir.1981)).

■ While the underpinnings of the Double Jeopardy Clause of the Fifth Amendment are somewhat different from the rationale supporting statutes of limitations, they are essentially the same in their design to assure fairness to the defendant. These "same offense" concepts of double jeopardy are instructive and can be borrowed in deciding whether a superseding indictment alleges the same conduct as a superseded indictment. If a former charge so tracks a subsequent charge that conviction or acquittal under the former would bar prosecution under the latter because of the Double Jeopardy Clause, the charges should also be construed as substantially similar for statute of limitations relation-back purposes.

### B. Application of Law to Facts

Application of Section 3282 of Title 18 of the United States Code to the 1993 indictment, without taking relation-back possibilities into account, would require finding June 10; 1988 as the statute of limitations cut-off date. Any acts that were charged in the 1990 indictment, however, which are "sufficiently similar" to those charged in the 1993 indictment have a statute of limitations cut-off of May 30, 1985.

#### 1. Post–Verdict Statute of Limitations Claims—Charges Dismissed

■ By way of post-verdict motion the defendant has moved to dismiss count four of the indictment charging defendant with conspiring to murder John and Gene Gotti. With respect to this charge, the jury made two findings: (1) that defendant was part of that conspiracy; and (2) that the conspiracy

ended in January, 1988. Since the statute of limitations starts to run once a conspiracy has ended, *United States v. Salerno*, 868 F.2d 524, 534 (2d Cir.1989), the government had to have filed charges for this crime by January, 1993. It did not. Pled only in the June 10, 1993 indictment, and not in that of 1990, the five year window preceding the filing of the charges closed on June 10, 1988—several months after the conspiracy to kill the Gotti brothers ended.

Whenever a jury returns a verdict of guilty upon charges that are time-barred, those charges must be dismissed. *See Toussie v. United States*, 397 U.S. 112, 114–15, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970). Substantive count four must be dismissed. The defense's post-trial Rule 29 motion as to this count is granted.

### 2. Pre–Verdict Statute of Limitations Claims—Charges Remaining

During trial the defense asserted that some of the remaining charges—specifically those predicate acts and substantive counts pertaining to labor payoffs and conspiring to extort—also raised statute of limitations problems. No ruling was rendered as to these claims. Given the jury's findings, the relation-back issues raised by the defense during trial are essentially moot. While it is not necessary for the final resolution of this case, a discussion of these arguments is appropriate since the issues raised may have significance should there be a retrial.

#### a. Count One

■ Count one of the indictment is a substantive racketeering count. The jury found that the defendant committed at least two related predicate acts under the racketeering statute. *See United States v. Long*, 917 F.2d 691, 696–97 (2d Cir.1990)(horizontal and vertical relatedness required). It was also determined that at least one was not time-barred by the five-year statute of limitations. *See United States v. Persico*, 832 F.2d 705, 714 (2d Cir.1987). The jury verdict plainly placed three of the proven predicate acts within the five years preceding the filing of the 1993 indictment—predicate acts nine, forty, and forty-one. Of the remaining predicate acts that were proven—ten through thirty-nine—all occurred within ten years of

the predicate acts nine, forty, and forty-one. Any number of permutations and combinations of these proven acts would support conviction. All were proven by evidence sufficient to warrant the jury verdict.

#### (1) Predicate Act Nine

Conspiracy to murder Peter Savino was charged as predicate act nine. The jury found that the government both proved beyond a reasonable doubt that defendant was a member of this conspiracy and that it lasted until July, 1991. This date falls within the five years preceding the filing of the 1993 indictment. As a result, this predicate act can be used to support the RICO conviction.

#### (2) Predicate Act Ten

Racketeering predicate act ten mirrored substantive count four, also charging the defendant with conspiring to murder John and Gene Gotti. When the jury considered this charge, as with its sister substantive charge, count four, it found that the conspiracy ended January, 1988. Count four has been dismissed because it violates the statute of limitations. Since this charge is a predicate act in a RICO prosecution, it may not be dismissed. Occurring within ten years of a related, non-time barred predicate act, it may be used to support conviction.

#### (3) Predicate Acts Eleven through Thirty–Three

Predicate acts eleven through thirty-three, each individual labor payoff charges relating to the control of the windows conspiracy, were all found to be proven. As to these, the jury was not required to find a date upon which each occurred since the parties stipulated to the dates set forth in the 1993 indictment and provided in the charts above. *See supra* section II(E)(2)(b). These stipulated dates ran from April 10, 1987 to January 20, 1988.

The defense contended that these acts were charged for the first time in the 1993 indictment with its June, 1988 statute of limitations cut-off date. It was its contention, therefore, that these predicate acts were time-barred. For a variety of reasons, these

acts are viable under applicable statute of limitations standards.

First, as noted above, *see supra* section II(I)(1)(a), these activities all occurred within ten years of predicate acts nine, forty, and forty one. Thus, even if they did occur prior to the five year window preceding the filing of the 1993 indictment, the RICO statute provides a basis allowing for these charges to support a RICO conviction. Second, contrary to the position of the defense, these actions were charged previously in the 1990 indictment as racketeering predicate acts fifty-five through seventy-seven, allowing for relation-back to the earlier statute of limitations cut-off date.

Predicate acts fifty-five through seventy-seven of the earlier indictment, the defense asserted, were charged under a different subsection of Section 186 of Title 29 of the United States Code than predicate acts eleven through thirty-three in the new indictment. It argued that relation-back was impermissible because the later indictment was charged under a subsection of law that required proof of an element above and beyond the subsection charged in 1990.

There can be no doubt that predicate acts eleven through thirty-three of the 1993 indictment charge the defendant under Section 186(a)(4) of Title 29 of the United States Code. The indictment both cites to that subsection of law and tracks its language. By contrast, the 1990 indictment does not cite or commit to a particular subsection of Section 186 with regard to predicate acts fifty-five through seventy-seven. The defense insists the 1990 document should be interpreted as having charged the defendant under subsection (a)(2) rather than (a)(4) based upon a comparison of the language of the 1990 indictment and the various sections under Section 186 of Title 29 of the United States Code.

The reading of the 1990 indictment proffered by the defense is plausible. The language of the 1990 indictment tracks the language of subsection (a)(2) rather than subsection (a)(4) since subsection (a)(4) requires intent to influence and subsection (a)(2) does not. In relevant part the 1990

indictment reads that the defendant and others:

> ... who were acting in the interest of an employer in an industry affecting commerce, together with others, did knowingly, willfully and unlawfully pay, lend, and deliver and agree to pay, lend and deliver sums of money in excess of One Thousand Dollars ($1,000) to, and for the benefit of, officers representatives, and employees of Local 580, which would admit to membership employees of such employer, with respect to the installation of replacement windows for the NYCHA projects listed below, in violation of Title 29, United States Code, Section 186(a) and (d) and Title 18, United States Code Section 2.

Subsection (a)(2) of Section 186 of Title 29 of the United States Code provides that it is illegal for:

> employers or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value-to any labor organization, or other officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce.

By contrast, subsection (a)(4) of Title 29, Section 186 of the United States Code makes it unlawful for:

> employers or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—to any officer or employee of a labor organization engaged in an industry affecting commerce *with intent to influence* him in respect to any of his actions, decisions, or duties as a representative of employees of as such officer or employee of such labor organization.

(Emphasis added.) The relevant part of the 1993 charge, tracking subsection (a)(4), reads that defendant together with others:

did knowingly, willfully and unlawfully aid and abet the employers specified below and persons acting in the interests of the specified employers to pay, lend and deliver, and agree to pay, lend and deliver, things of value and sums of money, in the amounts specified below, to officers and employees of Local 580 of the Architectural and Ornamental Ironworkers Union, a labor organization engaged in an industry affecting commerce, *with the intent to influence* such persons in respect to their actions, decisions and duties as officers and employers of Local 580. . . .

(Emphasis added.)

■ The difference between the two indictments does not prevent predicate acts fifty-five through seventy-seven of the 1990 indictment from being carried over as predicate acts eleven through thirty-three in the 1993 indictment for statute of limitations purposes. Many cases have approved relation-back where statutory provisions alleged in a more recent charging instrument are not identical to ones charged earlier even where the penalty may be greater. *See, e.g., United States v. Davis*, 953 F.2d 1482, 1492 (10th Cir.1992)(superseding indictment may name "a greater or lesser number of defendants as co-conspirators or contain a slightly different mix of closely related statutory violations . . . provided the essential nature of the conspiracy alleged in the first indictment remains the same."); *United States v. Italiano*, 894 F.2d 1280 (11th Cir.1990)(18 U.S.C. § 1341 and 18 U.S.C. § 3288); *United States v. Sears. Roebuck & Co.*, 785 F.2d 777, 779 (9th Cir.1986)(substitution of the general false statement provision in 18 U.S.C. § 542 did not expand or broaden the charges . . . since all the elements of a section 1001 prosecution are included in a section 542 charge); *cf. United States v. Elliott*, 849 F.2d 554, 561 (11th Cir.1988)("potential for imposition of greater penalty under a superseding indictment does not render such charges broader than those in the original indictment"). Charging under a different subsection of law does not prohibit relation-back to an earlier filing where one charge is an included offense of the other. *See, e.g., United States v. Gengo*, 808 F.2d 1,4 n. 1 (2d Cir.1986)(a new conspiracy objective charged under 26 U.S.C. § 7206(1), allowed to relate back to the lesser included offense of 26 U.S.C. § 7201, which had been charged in the first indictment).

Judge Telesca of the Western District of New York recently adopted a report and recommendation of Magistrate Judge Feldman, which read:

> [t]he fact that the new and old indictment do not charge identical crimes is not dispositive. The similarity of the indictments is not measured by simply comparing the statutory violations alleged, 'but also by the factual allegations that the government relies upon to show a violation of the statute.'

*United States v. Fronk*, 173 F.R.D. 59, 72 (W.D.N.Y.1997)(*citing United States v. Italiano*, 894 F.2d 1280, 1282 (11th Cir.1990)). The court declined to declare time-barred an entirely new charge to a superseding indictment, using the mail to commit a drug felony, in a case where the government previously had charged the defendant with conspiracy to distribute and possess cocaine with intent to distribute, distribution and possession of cocaine with intent to distribute, and use of a communication facility to commit a drug felony. *See United States v. Fronk*, 173 F.R.D. 59, 72 (W.D.N.Y.1997).

The defense is correct in its observation, but wrong in the conclusion it draws, when it says that subsection (a)(4) of Section 186 of Title 29 of the United States Code requires proof of an intent element which is not required by subsection (a)(2). Juries deciding a case under subsection (a)(4) require an additional instruction as compared to jurors deciding a case under (a)(2) because subsection (a)(4) "incorporates the additional element of intent to influence, similar to the state of mind element of a traditional bribery offense." 3 Leonard B. Sand, John S. Siffert, Walter P. Loughlin, and Steven A. Reiss, *Modern Federal Jury Instructions* 51–26 (1996); *see also United States v. Boylan*, 620 F.2d 359, 362 (2d Cir.)("[s]ection 186(a)(4) is posited on the intent of the maker of the payment"), *cert. denied*, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980); *United States v. Burge*, 990 F.2d 244, 250 (6th Cir.1992)(to violate 29 U.S.C. § 186(a)(4)

there must be actual intent to influence the union agent as to his actions), *cert. denied,* 508 U.S. 924, 113 S.Ct. 2379, 124 L.Ed.2d 283 (1993); *cf., Wabash Pub. Co. v. Dermer,* 650 F.Supp. 212, 214 (ND.Ill.1986)(in a civil case brought under 29 U.S.C. § 186, "subsection (a)(4) does require that any payment be made 'with intent to influence,' a requirement absent from subsection (a)(1)").

This issue of intent certainly would have been contemplated by the defense team when it was presented with the 1990 indictment. The old indictment clearly implies that the defendant sought to affect decisions of union officials, thereby implicating intent to influence. Without that motive there would be no need to make the huge payments involved. Given the obvious meaning of transactions described in the old indictment, it can not be said the defendant would not have believed his state of mind at the time payments were being made was in issue. Obviously he was put on notice that the motivations behind those payoffs and the reasons they were made would be relevant areas of inquiry at the trial of the 1990 indictments.

Even though the identity of the racketeering enterprises in each indictment was different—one being La Cosa Nostra (all the crime families acting together in an enterprise and conspiracy), the other being the Genovese Crime Family, Mr. Gigante's ties to the entire La Cosa Nostra were through his ties to the included sub-conspiracy that constituted the Genovese Crime Family. *Cf. United States v. Langella,* 804 F.2d 185, 188– 89 (2d Cir.1986)(if either the enterprise alleged or the pattern of activity alleged in a present prosecution is different from that of an earlier prosecution, there is no double jeopardy violation). Defendant was on notice in 1990 that his ties to the family of which he was boss was the essential factual element of the charge.

The two sets of charges fail to meet the basic *Blockburger* test requiring each of the successive prosecutions to contain an element the other does not have in order to be different for double jeopardy purposes. *See Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *Rutledge v. United States,* 517 U.S. 292,

——, 116 S.Ct. 1241, 1245, 134 L.Ed.2d 419 (1996)("two different statutes define the 'same offense,' typically because one is a lesser included offense of the other"). Here the two charges were lesser and greater degrees of the same offense.

Any potential problems arising out of the modification of the 1990 indictment were in the power of the defendant to resolve. The defendant had the ability after the filing of both the first and second indictments to seek further discovery. *See generally* Fed. R.Crim.P. 7(f) and 16. These tools would have provided the defendant with additional information or worked to clarify any ambiguities that existed in the charging documents. *See United States v. Jaswal,* 47 F.3d 539, 543 (2d Cir.1995)(admonishing that a defendant has the right to seek greater specificity in the indictment by way of a bill of particulars); *United States v. Macchia,* 35 F.3d 662, 670, n. 1 (2d Cir.1994)(a defendant is free to request a bill of particulars to clarify conspiracy charges).

Avoiding trial under the 1990 indictment advantaged defendant considerably. He had the full record of the earlier trial where experienced defense counsel opened every possible chink in the same evidentiary case defendant would have to meet under the 1993 indictment. The evidence introduced under the 1993 indictment was a replay of what defendant's co-conspirators faced in the trial of the 1990 indictment.

It was defendant who delayed the proceedings with his false claims of incompetence. *Cf. United States v. Gambino,* 59 F.3d 353, 359 (2d Cir.1995), *cert. denied,* —— U.S.——, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996)(when defendant's conduct causes period of delay, time that has run may be excluded from consideration for speedy trial purposes); *United States v. Oliva,* 46 F.3d 320, 325 (3d Cir.1995)(statute of limitations is an affirmative defense that can be waived). Whether collateral considerations should be considered in allowing relation-back is not decisive since, as a matter of law, the 1993 indictment relates back to that of 1990.

This present situation is distinguishable from those where a defendant is prejudiced

by the filing of a new indictment. *See United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 779 (9th Cir.1986). This is particularly true since the defense conceded no lack of notice as to these new charges. *See* Transcript of July 7, 1997 at 1577 ("We are not going to suggest that the defense was not put on notice in the 1990 indictment that the defendant was being called the to task for having done things that related to those alleged twenty-three payoffs."). Any variance between the old labor payoff predicate acts and the new ones can not be viewed as substantial. *Cf. United States v. Lytle*, 677 F.Supp. 1370, 1376 (N.D.Ill.1988)("changes in form rather than substance, do not undercut the notice provided by the earlier indictment"). Any one of predicate acts eleven through thirty-three may not only serve as the acts occurring within ten years of the non-time barred predicate acts, but may themselves serve as non-time barred predicate acts supporting the RICO conviction.

### (4). Predicate Acts Thirty–Four through Thirty–Nine

The jury found that the government proved predicate acts thirty-four through thirty-nine. These acts also relate to labor payoffs in furtherance of the racketeering scheme. As with predicate acts eleven through thirty-three, the jury was not required to make findings as to the dates these payoffs occurred because the parties stipulated to the dates charged in the 1993 indictment.

Noted in the chart above, *see supra* section II(E)(2)(b), the 1993 indictment charged that the payoffs occurred on dates ranging from January 7, 1988 to June 7, 1988. During earlier hearings in this case, the government essentially conceded that these acts were not charged as part of the 1990 indictment. Therefore, no relation-back may occur as to these counts. These charges may only serve as predicate acts that are related to the non-time barred acts and occurred within ten years of those acts.

### (5) Predicate Act Forty

Racketeering predicate act forty was a new charge in the 1993 indictment, alleging a labor payoff that occurred on June 27, 1988. This date was agreed upon by stipulation.

Since this act occurred within the five year window prior to June 10, 1993, there is no statute of limitations problem.

### (6) Predicate Act Forty–One

Predicate act forty-one charges an extortion conspiracy mirroring substantive count five. The indictment alleged that this conspiracy lasted from January of 1978 until December of 1989. As with the other conspiratorial charges, the jury was required to determine if defendant took part in this conspiracy and, if he did, the date upon which the conspiracy ended. The jury returned with a finding that defendant's participation in the conspiracy was proven and that the conspiracy ended in June of 1989. Since the jury determined that this conspiracy continued into the five years preceding the filing of the 1993 indictment, no statute of limitations problems are implicated. The act may serve as the non-time barred act supporting the RICO conviction. Even were the timing as computed by the jury incorrect, the defendant's argument would fail because of relation-back to the 1990 indictment.

At trial the defense argued that this predicate act should not benefit from any tolling that occurred with the filing of the 1990 indictment. First, it claimed that, something charged as a substantive count in one indictment could not "carry over" as a RICO predicate act in a later indictment. Because the extortion conspiracy was charged as substantive count three in the 1990 indictment, it urged that the government should not get the benefit of the earlier cut-off date for the crime now alleged as a predicate act.

■ This argument is unpersuasive. The defense did not claim lack of notice because a brand new allegation surfaced and surprised them. Nor could they. The extortion conspiracy was explicated at great length in count three of the 1990 indictment and was substantially the same as that which was charged in the 1993 indictment. Recasting the alleged violations as a predicate act rather than as an independent count is not a substantive change warranting dismissal of the predicate act.

■ The defense also contended that count three of the 1990 indictment could not be used to toll the statute of limitations for predicate act forty-one of the 1993 indictment because the basis for count three was a "larger" conspiracy than that contemplated by predicate act forty-one. Examining the language of predicate act forty-one of the new indictment, it is clear that the charges against the defendant were merely narrowed, streamlined, and restated as compared to what was alleged in the 1990 count three. This is permissible. *See United States v. Grady*, 544 F.2d 598, 602 (2d Cir.1976)(inquiry is whether second indictment broadened charges). Defendant was certainly put on full notice in 1990 that he was being charged with conspiring to extort monies in relation to window manufacturing and installation.

#### b. Count Two

The racketeering conspiracy charged in substantive count two was found to be proven. The jury found that this conspiracy continued until June, 1993. There are no statute of limitations problems with this count.

#### c. Count Three

In count three, defendant was charged with conspiring to murder Peter Savino. This count is new to the 1993 indictment and has a statute of limitations cut-off date of June 10, 1988. The jury found that this conspiracy lasted up until July, 1991. The charges were timely filed.

#### d. Count Five

Count five mirrors the extortion conspiracy charges alleged in predicate act forty-one. The jury, consistent with its finding as to act forty-one, found that the government proved this conspiracy and proved that it existed until June, 1989. Like predicate act forty-one, this count does not violate the statute of limitations. The defense argued at trial that this charge should not be given the benefit of relation-back since count five of the 1993 indictment did not mirror exactly what was alleged in count three of the 1990 indictment. While moot based upon the specific findings of the jury with regard to the duration of this conspiracy, defendant's claim lacks merit. This charge in its essentials was first brought in 1990 when defendant was put on notice.

#### e. Count Six

■ Finally, defendant was found guilty of participating in the substantive labor pay-off conspiracy alleged in count six. The jury found that this conspiracy lasted until June, 1988 but provided no specific day in June. Since the jury did not find that termination occurred on a particular day, it is important to ascertain whether the conduct alleged in count six was also alleged in the 1990 indictment so as to allow for relation back. The findings relating to predicate acts eleven through thirty-three, *see supra* section III(B)(2)(a)(3), apply. The relevant statute of limitations cut-off date for this count is May 30, 1985, five years prior to the filing of the 1990 indictment.

In count four of the 1990 indictment, the government charged that the defendant, along with others, participated in a labor payoff conspiracy. Attempts by the defendant and his cohorts to corruptly control the window manufacture and replacement industry were the crux of the allegations. While the government appeared to be charging the defendants in count four of the 1990 indictment with conspiring under subsection (a)(2) of Section 186 of Title 29 of the United States Code, the facts and circumstances underlying the charges are the same as those set forth in count six of the 1993 indictment, which charge the defendant with conspiring under subsection (a)(4).

Applying *Korfant* double-jeopardy analysis to these conspiracy charges demonstrates their material similarity. *See United States v. Korfant*, 771 F.2d 660, 662 (2d Cir.1985); *United States v. Russotti*, 717 F.2d 27, 32 (2d Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct.1273, 79 L.Ed.2d 678 (1984). First, the offenses charged are both part of the same statute, differing only by one element. *See United States v. Korfant*, 771 F.2d 660, 662 (2d Cir.1985)(criminal offense as charged). Second, third, and fourth, the conspiracies charged involved substantially the same set of actors, crime family members along with union members, over the same period, 1978 through to 1989, in the same location, New York. *See United States v. Korfant*, 771 F.2d

660, 662 (2d Cir.1985)(similarity of time, place, and membership as factors). Fifth and sixth, they were doing the same thing with the same objectives, conspiring to control the window industry by way of illegal payoffs. *See United States v. Korfant,* 771 F.2d 660, 662 (2d Cir.1985)(similarity of operation and common objectives as factors). Seventh and eighth, the same overt acts, individual payments, were involved and the conspiracies were intertwined. *See United States v. Korfant,* 771 F.2d 660, 662 (2d Cir.1985)(commonality of overt acts and interdependence between conspiracies as factors).

The *Russotti* factors, when applied to the charges, also demonstrate their similarity. While *Russotti* generally applies in successive racketeering prosecutions, its test is similar to *Korfant*'s and instructive. The time, identify of persons, statutory charges, nature and scope of the criminal activity and places where the acts took place are the same in the 1990 and 1993 charges. *See United States v. Russotti,* 717 F.2d 27, 33 (2d Cir.1983).

As with predicate acts eleven through thirty-three alleged in count one of the 1993 indictment, relation-back for count six must be permitted. This count does not violate the statute of limitations.

### 3. Charges Upon Which Jury Could Not Agree

■ The murder and murder conspiracies charged as racketeering predicate acts two through five play no part in the statute of limitations analysis because, as to them, the jury could not decide whether the acts were proven. Lack of findings, as to predicate acts two through five can not constitute determinations of guilt or non-guilt. *Cf. United States v. Ham,* 58 F.3d 78, 85 (4th Cir.)(jury's failure to affirmatively check-off information on a verdict sheet does not constitute an implied acquittal as to those charges), *cert. denied,* — U.S. ——, 116 S.Ct. 513, 133 L.Ed.2d 422 (1995). There appear to be no grounds to dismiss these charges because there has been no unnecessary delay in presenting charges to a grand jury, filing charges, or bringing the defendant to trial. *See, e.g.,* Fed.R.Crim.P. 48(b); *see also Doggett v. United States,* 505 U.S.

647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992)(dismissal appropriate where after eight-and-one half year pre-trial delay, most of which was attributable to the government); *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (parameters for Sixth Amendment speedy trial claims). Any delay must be attributed to the defense, given its many motions for adjournment and for assessment of defendant's competence. Dismissing these charges in the face of this history of defendant induced delay is not permissible. *See United States v. Dooling,* 406 F.2d 192, 198 (2d Cir.), *cert. denied,* 395 U.S. 911, 89 S.Ct. 1744, 23 L.Ed.2d 224 (1969)(when court improperly proposes to dismiss charges and such action is beyond its power, mandamus will lie).

Federal Rule of Criminal Procedure 26.3 provides for the granting of mistrials. "Before ordering mistrial, the court shall provide an opportunity for the government and for each defendant to comment on the propriety of the order including whether each party consents or objects to a mistrial, and to suggest any alternatives." Fed.R.Crim.P. 26.3. Based upon comments of counsel agreeing to dismissal of the jury when it reported its failure to agree on these issues, and the facts and circumstances in this case, a mistrial as to these charges is the appropriate remedy. *See Wade v. Hunter,* 336 U.S. 684, 688, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949)(failure of the jury to agree on a verdict permits for mistrial); *United States v. Huang,* 960 F.2d 1128, 1135 (2d Cir. 1992)(hung jury common example of when need for mistrial is manifest); *see also In re Ford,* 987 F.2d 334, 339 (6th Cir.), *cert. denied,* 506 U.S. 862, 113 S.Ct. 180, 121 L.Ed.2d 126 (1992)("[i]t is in a district court's sound discretion to declare a mistrial").

Granting a mistrial makes retrial on these charges possible. *Richardson v. United States,* 468 U.S. 317, 324–25, 104 S.Ct. 3081, 3085–86, 82 L.Ed.2d 242 (1984)(double jeopardy does not preclude second trial when retrial granted because of a hung jury); *United States v. Rosa,* 17 F.3d 1531, 1541 (2d Cir.)(same), *cert. denied,* 513 U.S. 879, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994). The prosecution should be aware, however, that if it

does not present any greater evidence as to these charges, dismissal at a later trial is likely.

## IV. Competency Issues

The defense seeks a *de novo* ruling finding the defendant incompetent prior to the trial, during the trial, and after the trial. Given the amount of time and energy spent by the parties grappling with these issues, a general discussion of the law of competency and capacity as it relates to this case is in order prior to addressing the narrow points raised by defendant.

### A. Competency and Standing Trial

The state of mind, mental abilities, and cognitive capacity of a defendant can in many ways affect his criminal prosecution and punishment. *See, e.g., Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)(constitutional prohibition of execution of insane defendant); *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)(competency to stand trial). Mens rea and other aspects of state of mind are critical in the administration the criminal justice system. *See, e.g., United States v. Cordoba–Hincapie,* 825 F.Supp. 485, 521–534 (E.D.N.Y.1993)("operation of the mens rea principle takes on a special character at the sentencing stage"); Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 39, at 296–97 (1972)(relationship between mental incompetency and the defense of insanity); Arthur R. Matthews, Jr., *Mental Disability and the Criminal Law* 10–21 (1970)(legal significance of mental illness in criminal justice and administration, including competence and negation of criminal responsibility); Rollin M. Perkins, *Perkins on Criminal Law* 739–783 (1969)(discussion of defendant's state of mind as element of crime): S. Sheldon Glueck, *Mental Disorder and the Criminal Law: A Study in Medico–Sociological Jurisprudence* (1927)(overview of mental disease and its effect upon various junctures of the criminal proceeding).

One of the concerns addressed most often is a defendant's capacity to take part in the trial. *See, e.g.,* Ronald Roesch, Stephen D. Hart, and Patricia A. Zapf, *Conceptualiz-ing and Assessing Competency to Stand Trial: Implications and Applications of the MacArthur Treatment Competence Model,* 2 Psychol. Pub. Pol'y & L. 96, 97–98 (1996)(outlining standards for competence to stand trial); *cf. Godinez v. Moran,* 509 U.S. 389, 403, 113 S.Ct. 2680, 2689, 125 L.Ed.2d 321 (1993)(Kennedy, J., concurring)("what is at issue here is whether the defendant has sufficient competence to take part in a criminal proceeding and to make the decisions throughout its course. This is not to imply that mental competence is the only aspect of a defendant's state of mind that is relevant during criminal proceedings."). Defendants who are incapable of contributing to their defense or of understanding the criminal proceedings against them are incompetent to stand trial. *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *United States v. Espinal,* 769 F.Supp. 116, 118 (S.D.N.Y.1991). While they remain incompetent they can not be tried. *Cooper v. Oklahoma,* 517 U.S. 348, ——, 116 S.Ct. 1373, 1376, 134 L.Ed.2d 498 (1996); *Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975); *see also,* Note, *Incompetency to Stand Trial,* 81 Harv. L. Rev. 454, 454 (1967)("[t]he question of competency to stand trial relates ... to the appropriateness of conducting the criminal proceeding in light of the defendant's present inability to participate effectively"). The Due Process Clause requires this result. *See, e.g., Cooper v. Oklahoma,* 517 U.S. 348, ——, 116 S.Ct. 1373, 1376, 134 L.Ed.2d 498 (1996). "[P]rohibition against trying the incompetent defendant was well-established by the time Hale and Blackstone wrote their famous commentaries." *Cooper v. Oklahoma,* 517 U.S. 348, ——, 116 S.Ct. 1373, 1376, 134 L.Ed.2d 498 (1996); *see Medina v. California,* 505 U.S. 437, 453, 112 S.Ct. 2572, 2581, 120 L.Ed.2d 353 (1992); *Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966); Ronald Roesch, Stephen D. Hart, and Patricia A. Zapf, *Conceptualiz-ing and Assessing Competency to Stand Trial: Implications and Applications of the MacArthur Treatment Competence Model,* 2 Psychol. Pub. Pol'y & L. 96, 97–98 (1996)(competency law in both Canada and

the United States finds its roots in English common law); Note, *Incompetency to Stand Trial*, 81 Harv. L. Rev. 454, 454 (1967)("[t]he common law provided, as a matter of fairness and humanity, that a person could not be criminally tried" if incompetent).

Blackstone explained,

[i]f a man in his sound memory commits a capital offence, and before arraignment for it he becomes mad, he ought not to be arraigned for it because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried; for how can he make his defence?

4 William Blackstone, *Commentaries* *24.

Because it was also recognized early on that defendants, knowing they could avoid trial by claiming mental defect might falsely do so, hearings on the issue of incompetence were strongly encouraged. 1 Hale P.C. *35 ("there may be great fraud in this matter ... the judge, before respite of trial or judgment, may do well to impanel a jury to inquire ... whether it be real or counterfeit").

Rules for raising the issue of a defendant's competence in modern federal criminal cases, and the basic procedures for trial-related competency hearings are codified in Section 4241 of title 18 of the United States Code. *See United States v. Renfroe*, 825 F.2d 763, 766 (3rd Cir.1987)(discussing Congress's decision to codify the standards of *Dusky); see also* 1 Charles Alan Wright, *Federal Practice and Procedure* § 196, at 719 (1982)(enactment of the original competency statute in 18 U.S.C. § 4244 and challenges to its constitutionality). The law provides:

At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and

consequences of the proceedings against him or to assist properly in his defense. 18 U.S.C. § 4241(a). *See also Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).

Prior to the hearing the court may order that an expert examine the defendant and submit a report outlining his findings. *See* 18 U.S.C. § 4241(b). At the competence hearing, a preponderance of the evidence standard governs; it is the defendant who bears the burden of persuasion. *See* 18 U.S.C. § 4241(d); *see also Cooper v. Oklahoma*, 517 U.S. 348, ——, 116 S.Ct. 1373, 1380, 134 L.Ed.2d 498 (1996)("Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence").

Hearings on the issue of competence can involve testimony from lay witnesses as well as from medical or mental health experts. *See United States v. Tesfa*, 404 F.Supp. 1259, 1264–67 (E.D.Pa.1975), *aff'd*, 544 F.2d 138 (3rd Cir.1976), *cert. denied*, 430 U.S. 910, 97 S.Ct. 1185, 51 L.Ed.2d 588 (1977). It has been suggested that expert testimony provided at competency hearings may be of limited value since testifying doctors do little more than recite information they have already provided by way of written report to the court. *See* Arthur R. Matthews, Jr., *Mental Disability and the Criminal Law* 75 (1970). Moreover, experts' reports are often based upon a limited amount of information about a defendant, his family and his history. *See* Arthur R. Matthews, Jr., Mental Disability and the Criminal Law 84 (1970); *see also* Note, *Incompetency to Stand Trial*, 81 Harv. L. Rev. 454, 469 (1967)(some commentators question "whether psychiatric expertise is needed at all in the application of competency standards ... since ... judges and lawyers, familiar with the capabilities required of a defendant, are best to assess competency to stand trial").

After a competency hearing, if the court finds that the defendant is "presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense," the

defendant will be committed to the custody of the Attorney General until he becomes competent to stand trial. 18 U.S.C. § 4241(d). If it is determined that he can not become competent, the defendant faces the possibility of involuntary hospitalization for an indefinite period of time. 18 U.S.C. §§ 4241(d), 4246.

Almost all cases addressing claims of incompetence involve situations where the defendant asserts mental defect. *See, e.g., United States v. Williams,* 113 F.3d 1155, 1159 (10th Cir.1997)("[c]ompetency involves defendant's mental state at the time of trial asking whether the accused is capable of cooperating in her own defense"). Some cases do involve defendants who claim to be physically incompetent to stand trial. *See, e.g., United States v. Bernstein,* 417 F.2d 641, 643 (2d Cir.1969); *United States v. Gambino,* 809 F.Supp. 1061, 1077 (S.D.N.Y. 1992); *see also* Note, *Incompetency to Stand Trial,* 81 Harv. L. Rev. 454, 459 (1967)("intellectual or physical handicap or emotional disturbance" may form the basis for an incompetency claim).

 The case of physical incapacity is distinct from mental incapacity. There is no statutory provision that allows for an official finding of physical incapacity. *See United States v. Knohl,* 379 F.2d 427, 436 (2d Cir. 1967), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967)(explaining that physical incompetence claims are not covered by federal competency statutes); *United States v. Jones,* 876 F.Supp. 395, 397 (N.D.N.Y. 1995)("court is unable to locate, despite much effort, any statutory basis to make a determination with regard to physical competency to stand trial"). The currently accepted remedy when the defendant is mentally, but not physically capable of proceeding with trial is a continuance as appropriate. *See United States v. Jones,* 876 F.Supp. 395, 397 (N.D.N.Y.1995). To determine whether a continuance based upon poor physical health is warranted, courts assess the medical evidence provided, the defendant's activities outside of the courthouse, any measures available to minimize the risks in court to defendant's health, the usefulness of the delay, as well as the seriousness of the case.

*United States v. Jones,* 876 F.Supp. 395, 397 (N.D.N.Y.1995).

On June 6, 1997, the court found defendant mentally and physically capable of standing trial. It provided by way of frequent recesses, short trial days, and attendance of a physician adequate protection against harm or fatigue to defendant that might interfere with his defense.

While competent to stand trial, Mr. Gigante was not in perfect health. His reported ailments and afflictions, though not grounds for avoidance of trial, were relevant to other issues at the trial itself. One legal questions raised by the facts of this case is whether a defendant discontinues his role in a criminal conspiracy when he becomes mentally infirm. Unlike capacity to stand trial which is decided by the judge, withdrawal from a conspiracy is decided by the jury.

**B. Competency and Withdrawing from a Conspiracy**

**1. Law**

The law of conspiracy was born in "the very early ages of common law" as a way to prevent citizens from bearing false witness against others. *See* Francis B. Sayre, *Criminal Conspiracy,* 35 Harv. L. Rev. 393, 394–96 (1922)(conspiracy law meant to prevent the specific abuse of "false indictments" and "vexatious lawsuits"); *see also,* 4 William Blackstone, *Commentaries* * 136–37 (discussion of crime of conspiracy which began to prevent the conviction of innocent men). It was not until the seventeenth century that agreeing with others to commit different kinds of acts became actionable. Francis B. Sayre, *Criminal Conspiracy,* 35 Harv. L. Rev. 393, 400 (1922).

Expanded enormously by federal cases and statutes, conspiracy theory is now utilized procedurally to extensively admit hearsay and substantively to expand inchoate crimes and to limit protections from the statute of limitations. Wayne R. LaFave and Austin W. Scott, Jr., *Criminal Law* § 61, at 455–58 (1972)(conspiracy charges provide prosecutors with evidentiary and procedural advantages). They are characterized as agreements between two or more actors to

engage in unlawful conduct. *See Pinkerton v. United States*, 328 U.S. 640, 649, 66 S.Ct. 1180, 1185, 90 L.Ed. 1489 (1946)("conspiracy is a partnership in crime"); *Hyde v. United States*, 225 U.S. 347, 359, 32 S.Ct. 793, 799, 56 L.Ed. 1114 (1912)(conspiracy is an "unlawful combination"); *Pettibone v. United States*, 148 U.S. 197, 203, 13 S.Ct. 542, 545, 37 L.Ed. 419 (1893)(conspiracy defined as "a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means"); *United States v. Greenfield*, 44 F.3d 1141, 1150 (2d Cir.1995)("conspiracy exists when persons combine and agree for the purpose of committing an unlawful act")(*citing* Black's Law Dictionary 309–10 (6th ed. 1990)). As Justice Jackson reminded us, "the modern crime of conspiracy is so vague that it almost defies definition." *Krulewitch v. United States*, 336 U.S. 440, 446, 69 S.Ct. 716, 720, 93 L.Ed. 790 (1949)(Jackson, J., concurring). Conspiracy theory provides federal prosecutors with a powerful flail to unseat criminals, a weapon so effective that many potential state prosecutions are shifted to the federal court by frustrated state district attorneys. Yet, its very effectiveness requires care that it is not utilized to commit injustice.

Its temporal flexibility is particularly dangerous to defendants seeking to rely on statute of limitations. Conspiracies came to be understood as crimes different from most others because of their continuing nature, extending over time. *See United States v. Wong*, 40 F.3d 1347, 1366 (2d Cir.1994)("conspiracy is a continuing crime"); *see also* Rollin M. Perkins, *Perkins on Criminal Law* 635 (1969)("[a] conspiracy ... always endures for some period of time although this may vary anywhere from a few seconds to a few years").

Mens rea is critical to conspiracy. Conspiracy law requires a defendant to have the requisite guilty state of mind before liability may be found. Historically, the intent element for conspiracies has been criticized as a difficult and complex creature. *See* Note, *Developments in the Law of Criminal Conspiracy*, 72 Harv. L. Rev. 920, 935 (1959); *see*

*also* Note, *The Conspiracy Dilemma: Prosecution of Group Crime or Protection of Individual Defendants*, 62 Harv. L. Rev. 276, 280 (1948)("[t]he factor of intent in conspiracy is complicated by the fact that the criminal 'act' is an agreement, which is itself subjective and involves as an essential element an intent to agree"). At the most basic level, the defendant must have the intent both to agree with his co-conspirators and to join in their illegal activities. *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990); *see also* Rollin M. Perkins, *Perkins on Criminal Law* 629 (1969)("the conspirator's intent is always two fold"). Because the crime "consists primarily of a meeting of the minds and an intent," without knowledge and agreement a person can not be held accountable for the criminal combination. *Krulewitch v. United States*, 336 U.S. 440, 448, 69 S.Ct. 716, 720, 93 L.Ed. 790 (1949)(Jackson, J., concurring).

■ As an added protection to defendants against punishment for mere talk, in some instances an overt act must take place in furtherance of the conspiracy. *See, e.g., United States v. Wallace*, 85 F.3d 1063, 1068 (2d Cir.1996)(under 18 U.S.C. § 371, a conspiracy requires proof of an agreement, intent, and "an overt act in furtherance of the agreement"). To enhance prosecutorial power against racketeering, RICO conspiracies do not require proof of an overt act; the critical added element is that defendant agreed to aid in committing two predicate acts. *See United States v. Rastelli*, 870 F.2d 822, 832 (2d Cir.1989); *cf. Hyde v. United States*, 225 U.S. 347, 359, 32 S.Ct. 793, 799, 56 L.Ed. 1114 (1912)(at common law no overt act required for conspirator liability).

■ Once a conspirator joins a conspiracy he is deemed a member for its duration absent his clear exiting. As crimes that are continuing in nature, there is an assumption that conspiracies do not come to an end until "the purposes of the conspiracy have been accomplished or abandoned." *Hyde v. United States*, 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912); *see also United States v. Rastelli*, 870 F.2d 822, 838 (2d Cir.1989)(same); *United States v. Katz*,

601 F.2d 66, 68 (2d Cir.1979)("the conspiracy is presumed to continue until the last overt act by any of the conspirators"). While "the offense has not been terminated or accomplished, [the defendant] is still offending." *See Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912); *see also* 15A C.J.S. *Conspiracy* § 35(2), at 724 (1967)(conspiracies continue to exist "until consummated, abandoned, or otherwise terminated by some affirmative act.").

Termination as to one defendant does not necessarily mean an end to continuing culpability as to all members of the conspiracy. A single member may terminate his own involvement with the group. *See Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912)(a conspirator does have the power to leave a conspiracy that he has entered into); *cf. Model Penal Code and Commentaries* § 5.03, at 457 (Official Draft and Revised Comments 1985)(the "traditional rule" was that "since the crime of conspiracy was complete with the agreement, no subsequent action can exonerate the conspirator"). Unilateral termination is often referred to as "withdrawal;" it can limit a defendant's liability, particularly when the statute of limitations intervenes.

Withdrawal as an escape has limitations. *See United States v. Read,* 658 F.2d 1225, 1232–33 (7th Cir.1981)(withdrawal is not a "complete defense to the crime of conspiracy"); *see also* Note, *The Withdrawal Defense to Criminal Conspiracy: An Unconstitutional Allocation of the Burden of Proof,* 51 Geo. Wash. L. Rev. 420, 422–23 (1983); 15A C.J.S. Conspiracy § 78, at 836–37 (1967)(where there is no overt act requirement, withdrawal from a conspiracy does not relieve a defendant from criminal responsibility). It has been said that where a conspiracy requires proof of an overt act, that act being considered the "locus poenitentiae," timely withdrawal before the overt act is committed can prevent any liability. *United States v. Sarault,* 840 F.2d 1479, 1486 (9th Cir.1988)("In order to avoid complicity in the conspiracy, one must withdraw before any overt act is taken in furtherance of the agreement"); *cf.* 15A C.J.S. *Conspiracy* § 78, at 836–37 (1967)("[w]here no overt act is required to complete the offense of conspiracy, its subsequent abandonment by the conspirators, or the withdrawal of a member, does not relieve them or him from criminal responsibility").

Defendants, however, are responsible for crimes flowing from the conspiracy prior to withdrawal. *See United States v. Read,* 658 F.2d 1225, 1232–33 (7th Cir.1981)("defendant is still liable ... for his previous agreement and for the previous acts of his co-conspirators in pursuit of the conspiracy" after withdrawal). Thus, for full protection against prosecution, the defense of withdrawal must be combined with a valid statute of limitations claim. *See, e.g., United States v. Salerno,* 868 F.2d 524, 534 n. 4 (2d Cir.1989)(a conspirator can "commence the running of the statute of limitations as to him by affirmatively withdrawing from the conspiracy"); *United States v. Read,* 658 F.2d 1225, 1233 (7th Cir.1981)("[i]t is thus only the interaction of the two defenses of withdrawal and the statute of limitations which shields the defendant from liability"); *see also,* Wayne R. LaFave and Austin W. Scott, Jr., *Criminal Law* § 486, at 486 (1972)("the defendant ... may want to prove his withdrawal so as to show that as to him the statute of limitations has run"); Julia Cheung, Maria T. Pelaia, and Christopher J. Sullivan, *Ninth Survey of White Collar Crime: Federal Criminal Conspiracy,* 31 Am. Crim. L. Rev. 591, 620 (1994)(same).

The imperfect defense of withdrawal is somewhat different from the more complete defense of "renunciation of criminal purpose" suggested by Professor Herbert Wechsler and the other drafters of the Model Penal Code. *See* Model Penal Code and Commentaries § 5.03, at 456 (Official Draft and Revised Comments 1985)(pointing out that many courts confuse the concepts of renunciation of criminal purpose, abandonment, and withdrawal, which the Code recognizes as distinct). The Code provides: if "after conspiring to commit a crime, [a defendant] thwarted the success of the conspiracy under circumstances manifesting a complete and voluntary renunciation of his criminal purpose," he should have available to him the defense of renunciation, separate and distinct

from a claim of withdrawal. *See Model Penal Code* § 5.03(6), at 78 (Official Draft and Explanatory Notes 1985); *see also* Herbert Wechsler, William Kenneth Jones, and Harold L. Korn, *The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation, and Conspiracy,* 61 Colum. L. Rev. 957, 1004 (1961); Note, *The Withdrawal Defense to Criminal Conspiracy: An Unconstitutional Allocation of the Burden of Proof,* 51 Geo. Wash. L. Rev. 420, 422–23 (1983)(renunciation analytically distinct from withdrawal). The Model Code did recognize the separate concept of withdrawal, providing that a defendant who personally abandons a conspiracy by notifying law enforcement agents or by informing his co-conspirators can begin the running of the statute of limitations as to himself. *Model Penal Code* § 5.03(7)(c), at 384 (Official Draft and Explanatory Notes 1985).

■ A party has to do more than simply cease to act to further a conspiracy's ends if he wishes to withdraw. *United States v. Nerlinger,* 862 F.2d 967, 974 (2d Cir.1988); *cf., United States v. Greenfield,* 44 F.3d 1141, 1150 (2d Cir.1995)(the law requires more than mere cessation because "it is all too easy after the fact for a defendant to claim that he or she withdrew from a plot"). A defendant must: (1) take affirmative action to show that he has truly broken with that part of the criminal enterprise to which he agreed to participate; and (2) communicate his abandonment to his co-conspirators. *See, e.g., United States v. Borelli,* 336 F.2d 376, 387–388 (2d Cir.1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965); *see also,* Wayne R. LaFave and Austin W. Scott, Jr., *Criminal Law* § 62, at 486 (1972)(similar tests for withdrawal are used by most courts).

The defendant has generally been held to have the burden of proving withdrawal. *See, e.g., United States v. Borelli,* 336 F.2d 376, 390 (2d Cir.1964). *But see Ware v. United States,* 154 F. 577 (8th Cir.), *cert. denied,* 207 U.S. 588 28 S.Ct. 255, 52, L.Ed. 353 (1907)(traditional rule was that the prosecution had burden to prove that defendant had not withdrawn). It is not clear what must be shown to meet this burden of withdrawal.

*See, e.g., United States v. Goldberg,* 401 F.2d 644, 648 (2d Cir.1968), *cert. denied,* 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790 (1969)("the burden of establishing an effective withdrawal from a conspiracy rests upon the defendant" and once proved it entitles him to an acquittal "as a matter of law"); *see also United States v. James,* 609 F.2d 36, 41 (2d Cir.1979), *cert. denied,* 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980)("burden of proof of withdrawal rests on the defendant").

One court, treating the rule as one of a presumption, has said that with the introduction of some evidence of withdrawal, the defense has met its burden of production and the government resumes the burden of persuasion on the ultimate issue of withdrawal. *See United States v. Read,* 658 F.2d 1225, 1236 (7th Cir.1980). After the withdrawal issue has been raised by defendant's proof, *Read* explained, the government must prove beyond a reasonable doubt that the defendant had not withdrawn from the conspiracy. *Read,* 658 F.2d 1225, 1236 (7th Cir.1980)(the government bears burden of disproving defense beyond a reasonable doubt); *cf.* Note, *The Withdrawal Defense to Criminal Conspiracy: An Unconstitutional Allocation of the Burden of Proof,* 51 Geo. Wash. L. Rev. 420 (1983)(arguing against allocating any burden to the defense).

The Supreme Court has recognized that a broad range of situations may satisfy the test for withdrawal. *See United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). In *Gypsum,* the trial court had instructed jurors that in order to find that withdrawal occurred the defendant needed to prove that he either (1) notified each member of the conspiracy that he would no longer be taking part in the crime or (2) disclosed the scheme to law enforcement. *United States v. United States Gypsum Co.,* 438 U.S. 422, 463–64, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978). Stating that the instruction "limited the jury's consideration to only two circumscribed and arguably impractical methods of demonstrating withdrawal," the Court reversed, explaining that the law does not require "confining blinders be placed on the jury's freedom to consider evidence" of withdrawal. *United*

*States v. United States Gypsum Co.,* 438 U.S. 422, 464, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978).

Other cases demonstrate that the test for withdrawal is not strictly construed. For instance, in *United States v. Goldberg,* 401 F.2d 644, 648–49 (2d Cir.1968), a defendant was found to have withdrawn from a conspiracy to violate the Securities Act of 1933 and mail and wire fraud statutes. He was charged with others in a security vending corporation for selling worthless stocks to their customers as part of a illegal scheme. *United States v. Goldberg,* 401 F.2d 644, 646–47 (2d Cir.1968). The defendant's act of leaving the employ of the company and notifying his customers and the organization that had licensed him of his departure, was sufficient to constitute a withdrawal from the conspiracy without any more specific notification of withdrawal to his co-conspirators. *United States v. Goldberg,* 401 F.2d 644, 648–49 (2d Cir.1968).

 Despite some argument to the contrary, actions taken by the defendant to break from the agreement need not be truly voluntary. *See, e.g.,* Note, *Developments in the Law of Criminal Conspiracy,* 72 Harv. L. Rev. 920, 957 (1959)("[t]he term withdrawal refers to voluntary action by a conspirator"). This proposition is supported by cases involving incarcerated conspirators who, based upon their jail stay, claim they have withdrawn because they can no longer participate. *See, e.g., United States v. Agueci,* 310 F.2d 817 (2d Cir.1962), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). In *Agueci,* where the defendant voluntarily turned himself over to the police, the court of appeals stated: "arrest or incarceration may constitute a withdrawal from a conspiracy." *United States v. Agueci,* 310 F.2d 817, 839 (2d Cir.1962). Incarceration is not a per se withdrawal. *United States v. Agueci,* 310 F.2d 817, 839 (2d Cir.1962); *cf. United States v. Castellano,* 610 F.Supp. 1359, 1419 (S.D.N.Y.1985)(presumption of withdrawal where defendant has been arrested and incarcerated on a conspiracy charge). The question of whether incarceration constitutes withdrawal is one of fact to be decided by a jury. *See, e.g., United States v. Panebianco,*

543 F.2d 447, 454 n. 5 (2d Cir.1976). "[I]n light of the length and location of the internment, the nature of the conspiracy, and any other available evidence," a jury may should decide if incarceration took the defendant out of the conspiracy. *Panebianco,* 543 F.2d 447, 454 n. 5 (2d Cir.1976); *see also United States v. Borelli,* 336 F.2d 376, 390 (2d Cir. 1964)(where defendant's attorney, for tactical reasons, chose not to raise issue of defendant's incarceration, the court explained, "if on retrial [defendant] chooses to place the fact in evidence, this will raise a question for the jury on the issue of his withdrawal"). This court has often had to deal with defendants, particularly in organized crime cases, who continued to direct a conspiracy while incarcerated.

Despite the plethora of conspiracy cases dealing with the issue of withdrawal, none appears to specifically address the unique question potentially raised in this case—is the onset of an incapacitating illness a withdrawal? The only case thus far found approaching such a situation is *United States v. Phillips,* 630 F.2d 1138, 1146–47 (6th Cir. 1980). *Phillips* held that in a two person conspiracy, one conspirator can not be found guilty if his co-conspirator was mentally incompetent at the time of agreement.

The defendant in *Phillips* had been incarcerated prior to the charges in the case. *United States v. Phillips,* 630 F.2d 1138, 1139 (6th Cir.1980). One morning while the defendant was being transported from the courthouse by law enforcement officials, his wife, who was suffering from paranoid schizophrenia, pulled up in front of the building, jumped out of her car with a gun, and shot at the marshals who were escorting her husband. *United States v. Phillips,* 630 F.2d 1138, 1139 (6th Cir.1980). Defendant encouraged his wife to shoot and attempted to disarm the marshals himself. *United States v. Phillips,* 630 F.2d 1138, 1139–40 (6th Cir. 1980). Despite the defendant's affirmative actions in furtherance of his wife's attack, the court explained "[t]he trouble here is the uncontroverted proof that Melissa [the wife] was mentally ill at the time she is alleged to have conspired and therefore was incapable of committing the offense. She did not have

the capacity to enter into an agreement." *United States v. Phillips,* 630 F.2d 1138, 1146 (6th Cir.1980). The conspiracy judgment against the husband was reversed because conspiring with an incompetent, it was held, is the same as conspiring with one's self. *United States v. Phillips,* 630 F.2d 1138, 1147 (6th Cir.1980); 4 William Blackstone, *Commentaries* \*136 n. 45 ("[t]o constitute a conspiracy ... there must be at least two persons implicated ... a husband and wife cannot be guilty of it"). *But cf., Stourzenegger v. United States,* 1991 WL 130896, at \*2 (S.D.N.Y. July 9, 1991), *aff'd,* 956 F.2d 1159 (2d Cir.1992)("mental withdrawal is not a defense to conspiracy"); *Model Penal Code* § 5.04(1)(Official Draft and Revised Commentaries 1985)(liability for conspiracy even if a conspirator conspires with a person who is irresponsible or is unable to hold a certain position required to succeed).

### 2. Application of Law to Facts

#### a. Relevant Facts

■ It is claimed that defendant now suffers from dementia, paranoia, and perhaps Alzheimer's disease and that he has been mentally incompetent since the mid–1980's. Since a person suffering from mental illness can not be held accountable as a conspirator, a claim of withdrawal should be available to defendants who become mentally ill while a member of a conspiracy. Cases holding that a defendant's incarceration may be interpreted as withdrawal support this proposition. Like the jailed conspirator, the incapable one presumably has not "voluntarily" chosen his predicament. Justice dictates a jury charge on the issue of withdrawal for the defendant whose mind can no longer "meet" with those of his co-conspirators.

#### b. Jury Charge Offered

The court offered to instruct the jury on the issue of withdrawal based on mental incapacity. The proposed language of the charge read: "A person can withdraw from a conspiracy by taking direct affirmative steps to abandon or end his participation in, and effort to promote, the conspiracy. One may also withdraw from a conspiracy through impossibility of continuing participation because of mental incompetence."

#### c. Rejection of Proposed Withdrawal Charge

The defense, however, explicitly decided against raising the withdrawal issue. It requested that the preceding instruction regarding mental withdrawal not be given and decided, for tactical reasons, to present a defense simply denying that Mr. Gigante was ever a member of the charged conspiracies.

#### d. Effect of Failure to Accept Proposed Charge

■ The decision on the part of Mr. Gigante and his attorneys not to raise the issue of withdrawal was not unsound in light of the evidence anticipated. The attorneys representing Mr. Gigante were skilled, thoughtful, and arrived at a reasoned decision to avoid the issue of withdrawal via Mr. Gigante's purported mental incapacity. The issue has been waived and is not available as a basis for new trial or other relief. There is no issue of inadequacy of counsel.

### C. Competency and Sentencing

Just as an incompetent person may not stand trial, it has long been understood that he may not be sentenced. *See United States v. Garrett,* 903 F.2d 1105, 1115 (7th Cir.), *cert. denied,* 498 U.S. 905, 111 S.Ct. 272, 112 L.Ed.2d 227 (1990)("need for competency also extends beyond trial to the sentencing phase of a proceeding"); 4 William Blackstone, *Commentaries* \*24–25 ("[i]f, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced ... for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution"). A "court should not proceed with sentence unless the defendant is mentally competent." *Saddler v. United States,* 531 F.2d 83, 86 (2d Cir.1976); *United States v. DeLuca,* 529 F.Supp. 351, 356 (S.D.N.Y. 1982)("if the Court had sentenced defendant in spite of his incompetence the sentence would clearly have been invalid").

In describing a rationale for this rule, the Second Circuit has focused upon the defendant's rule-based right to allocution at sen-

**174**

tencing. *See Saddler v. United States*, 531 F.2d 83, 86 (2d Cir.1976)("his right of allocation would be meaningless" if he were sentenced while he was incompetent (*citing Green v. United States*, 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961))); *see also* Fed.R.Crim.P. 32.

Sentencing is a critical stage of the criminal proceeding. *See Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Since the Due Process Clause requires that a defendant be competent at trial in order to contribute to his defense, it must require the same degree of competence at the penalty imposition phase of the proceeding. *See Godinez v. Moran*, 509 U.S. 389, 403, 113 S.Ct. 2680, 2689, 125 L.Ed.2d 321 (1993)(J. Kennedy concurring)("[t]he Due Process Clause does not mandate different standards of competency at various stages of or for different decisions made during the criminal proceedings").

The Supreme Court has created bright-line standards for the determination of competency for many aspects of criminal proceeding. *See, e.g., Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). It has not explicitly done so for the specific issue of competency at sentencing. This may be because the issue does not arise often. *See Hall v. United States*, 410 F.2d 653, 658 (4th Cir.)("[m]ost of the cases considering allegations of defendants' mental incompetency are concerned with alleged incompetency prior to or at trial"), *cert. denied*, 396 U.S. 970, 90 S.Ct. 455, 24 L.Ed.2d 436(1969). Or, it may be so well understood that incompetent defendants may not be sentenced that the same competency standards as for trial are assumed to apply. *See, e.g., United States v. Collins*, 949 F.2d 921, 924 (7th Cir.1991)("unquestionably" competency must extend to sentencing); *United States v. Pellerito*, 878 F.2d 1535, 1544 (1st Cir.1989)("[s]urely, the sentencing process necessitates" the same standards as required at trial per *Dusky*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)); *Youtsey v. United States*, 97 F. 937, 940 (6th Cir.1899)("[i]t is fundamental that an insane person can neither plead to an arraignment, be subjected to a trial, or, after trial, receive judgment, or, after judgment, undergo pun-

ishment"); *cf. Nobles v. Georgia*, 168 U.S. 398, 18 S.Ct. 87, 42 L.Ed. 515 (1897)("[i]t is agreed that at common law an insane person was not to suffer punishment"). *But see Hall v. United States*, 410 F.2d 653, 658 (4th Cir.1969)("[w]hen the issue of mental competency relates only to the time of sentencing, there is less danger that any substantive rights of a defendant would be prejudiced if he then suffers some degree of incompetence"); *United States v. Liberatore*, 846 F.Supp. 569, 576 (N.D.Ohio 1994), *aff'd*, 62 F.3d 1418 (6th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 523, 133 L.Ed.2d 430 (1995)(implying defendant may not need the same level of competence for sentencing as for trial).

Congress shed some light on this issue in 18 U.S.C. § 4241, which provides that at any time after the commencement of a prosecution mental competency may be challenged. Additionally, in 1984, federal statutes relating to mentally ill persons involved in the criminal justice system were amended. *See* Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 403(a), 98 Stat. 2061 (1984), *reprinted in* 1984 U.S. Code Cong. & Admin. News 3427. The changes created statutory procedures for courts faced with defendants who pre-sentence, but post trial or plea, appeared to be suffering from mental illness. 18 U.S.C. § 4244.

The statute provides: if a court is of the opinion that a defendant at the time of sentencing is "suffering from mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility," the court shall grant a hearing on the issue of defendant's mental health. 18 U.S.C. § 4244(a). The hearing shall be conducted, like hearings under Section 4241 of Title 18 of the United States Code, pursuant to the strictures of Section 4247(d) of Title 18. If, after the hearing, the court, by a preponderance of the evidence, determines that the defendant is in fact suffering from mental disease or defect *and* that the defendant should "in lieu of being sentenced to imprisonment, be committed to a suitable facility for care or treatment, the court shall commit the defendant to the custody of the Attorney General." 18 U.S.C. § 4244(d)(emphasis added). Thus, a defendant may suffer from some degree of mental illness but not necessarily be a candidate for

hospitalization under Section 4244(d) of Title 18 of the United States Code. *See United States v. Buker,* 902 F.2d 769, 769–70 (9th Cir.1990).

If this section of law is invoked and the defendant is delivered to the Attorney General, the defendant must be hospitalized in a suitable facility. 18 U.S.C. § 4244(d). Because such hospitalization is considered a "provisional sentencing of imprisonment," its duration is for the "maximum term authorized by law for the offense of which the defendant was found guilty," unless the defendant recovers from his illness. 18 U.S.C. § 4244(d) & (e). If he does recover, the court is notified, as are the parties. 18 U.S.C. § 4244(e). Should any additional period of sentence remain once the defendant regains mental stability, the court proceeds to final sentencing. 18 U.S.C. § 4244(e).

■ Under the statute a defendant may, as a practical matter, be incarcerated for a provisional sentence in a hospital much longer than if he were sentenced. This is because the maximum sentence contemplated by Section 4244 of Title 18 of the United States Code is the statutory maximum, including consecutive terms, not the maximum under the sentencing guidelines. *See United States v. Moses,* 106 F.3d 1273, 1275 n. 1 (6th Cir.1997)(" 'the maximum term authorized by law' refers to the statutory maximum for the offense, not the maximum sentence allowed by the Sentencing Guidelines"); *United States v. Roberts,* 915 F.2d 889, 892 (4th Cir.1990), *cert. denied,* 498 U.S. 1122, 111 S.Ct. 1079, 112 L.Ed.2d 1184 (1991)("if Congress had wanted maximum term authorized by law [in 18 U.S.C. § 4244] to mean maximum term authorized by the sentencing guidelines, it could have said so").

These factors suggest that the sentencing competency hearing must be conducted with scrupulous care. Which side has the burden of proof may vary with the equities and claims. As with pretrial competency procedures, there is no statute relating to physical capability at sentencing. Particularly under guideline sentencing, the process requires an evidentiary hearing and detailed fact-finding. *See, e.g., United States v. Fatico,* 458 F.Supp. 388 (E.D.N.Y.1978), *aff'd,* 603 F.2d 1053

(1979). This aspect of the incompetency issue will be addressed at a separate hearing on sentencing. At the moment, addressing the motion for a new trial, it is only competency at trial that is in issue.

### D. New Evidence and Incompetency Claims

#### 1. Relevant Facts

Based upon the law set forth in section IV(C) *supra,* following the jury's verdict on July 25, 1997, defendant was remanded to the custody of the Attorney General. As noted in section II(J) *supra,* defendant surrendered at the Federal Correctional Institution in Butner, North Carolina. At the Butner facility the defendant was examined and a Report was prepared pursuant to Section 4247 of Title 18 of the United States Code.

After an extended period of observation the Staff Psychiatrist, Peter N. Barboriak, M.D., Ph.D. and the Staff Clinical Psychologist, Mark Hazelrigg, Ph.D., of the Mental Health Division of the Federal Correctional Institution made extensive findings in an eighteen page, single-spaced report. From the Report it is apparent that defendant responded to the questions posed to him by Butner's staff, participated meaningfully in the evaluation procedures, and communicated effectively with his evaluators. Defendant, it was said "tolerated long interviews without severe anxiety, pacing, or the need to leave the room" and "often displayed emotional warmth and a sense of humor." Report at 12.

The views of Dr. Barboriak and Dr. Hazelrigg are summed up in part supporting the court's finding of feigning as follows:

> Mr. Gigante has a long history of psychiatric treatment for complaints of psychotic symptoms. We cannot definitively state that all reported symptoms were malingered but, Mr. Gigante's presentation of psychotic symptoms has been atypical in many ways. For example, he has not shown a consistent deterioration of personality functioning to be expected with a mental illness such as Schizophrenia. We have therefore diagnosed Mr. Gigante with Possible Psychotic Disorder, Not Other-

wise Specified, By History, but this disorder is not active and Mr. Gigante has no genuine symptoms of any psychotic disorder.

During the course of this evaluation, Mr. Gigante exhibited inconsistencies in his reports and responses to psychotic symptoms and cognitive deficits which were consistent with a diagnosis of Malingering. Malingering is a diagnosis given to individuals who intentionally produce false or grossly exaggerated psychological symptoms motivated by external incentives, in this case avoiding criminal prosecution. At times, Mr. Gigante appeared to exaggerate pre-existing impairments, especially in regards to his legal situation, nevertheless, we can not determine, at this point, to what degree the cognitive impairment Mr. Gigante exhibited by [sic] during the course of this hospitalization was due to malingering. The psychotic symptoms reported do appear to have been false.

Report at 17.

### 2. Law

■ A defendant, found competent pretrial, is presumed to be competent throughout his prosecution. A post-trial claim that recently discovered information belies a prior finding of competence must, therefore, be treated in the same way as a motion for a new trial on the basis of new evidence. *See, e.g., United States v. McCarthy*, 54 F.3d 51, 54–56 (2d Cir.1995). Relief based upon such a claim will only be granted if justice so requires. Fed.R.Crim.P. 33.

■ Post-trial claims based upon newly-found information must be met with caution. *Orena v. United States*, 956 F.Supp. 1071, 1093 (E.D.N.Y.1997). "Although defendants are tireless in seeking new trials based upon newly discovered evidence, motions on this ground are not favored...." 3 Charles Alan Wright, *Federal Practice and Procedure* § 557, at 315 (2d ed.1982). Only under the most extraordinary circumstances will retrial based upon new evidence be granted. *Orena v. United States*, 956 F.Supp. 1071, 1093 (E.D.N.Y.1997) (citations and quotation marks omitted). It is the defendant seeking a new trial after the return of the verdict who bears the heavy burden of showing that redetermination is warranted. *See* Fed. R.Crim.P. 33; *United States v. Adamson*, 592 F.2d 907, 908 (5th Cir.1979)(a defendant seeking a new trial assumes the burden under Federal Rule of Criminal Procedure 33).

■ Generally, a defendant seeking a new trial must prove:

(1) that the evidence was newly discovered and was unknown to the defendant[ ] at the time of the trial; (2) that the evidence was material, not merely cumulative or impeaching; (3) that it would probably produce an acquittal; and (4) that failure to learn of the evidence was due to no lack of diligence on the part of the defendant[ ].

*United States v. Adamson*, 592 F.2d 907, 908 (5th Cir.1979), *cert. denied*, 444 U.S. 949, 100 S.Ct. 420, 62 L.Ed.2d 318 (1979). When

the newly discovered evidence pertains not to the defendant's guilt, but to his competency to stand trial, [the court] must examine whether the new evidence indicates that the defendant did not have "sufficient ... ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him."

*United States v. McCarthy*, 54 F.3d 51, 55 (2d Cir.)(*citing Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 788, 4 L.Ed.2d 824 (1960)), *cert. denied*, —— U.S. ——, 116 S.Ct. 214, 133 L.Ed.2d 145 (1995).

### 3. Application of Law to Facts

■ Defendant's motion for a new trial because he was incompetent at trial based upon alleged "new" evidence lacks merit. Contrary to the defendant's assertions, the information contained in the Butner Report does not undermine the prior findings of competency by this court. Rather, the suggested partial diagnosis of "malingering" indicated in the Report supports Judge Nickerson's determination that defendant Gigante feigned mental illness over many years in order to avoid his day of reckoning.

The Report suggests that defendant's catatonic state at trial was inconsistent with his capacity. At trial he sat mute, interacting

with no one, staring off into space. Yet, at Butner he understood the questions, directives, and instructions of those examining him. Mr. Gigante was able to communicate with Butner's mental health professionals during the forty-five day assessment period.

Defendant's motion for a new trial based upon his request for a *de novo* determination of his lack of competence at trial must be denied.

### V. Conclusion

Count four of the indictment is dismissed. A mistrial is granted as to racketeering predicate acts two through five. Defendant's remaining motions are denied.

So Ordered.

Exhibit A: Completed Jury Verdict Sheet

## VERDICT SHEET

### AS TO COUNT ONE
(Racketeering)

A. How do you find the defendant as to Count One

Guilty __X__ Not Guilty _____

[Whether your answer is guilty or not guilty, answer the following subsidiary questions]

1a. As To Racketeering Act One
(Conspiracy to murder Jerry Pappa)

Proven _____ Not Proven __X__

1b. (Murder of Jerry Pappa)

Proven _____ Not Proven __X__

2a. As To Racketeering Act Two Proven _____ CANNOT AGREE Not Proven _____
(Conspiracy to murder Anthony Caponigro, Fred Salerno, John "Keys" Simone, Frank Sindone and others)

2b. (Murder of Anthony Capongiro) Proven _____ CANNOT AGREE Not Proven _____

3. As To Racketeering Act Three Proven _____ CANNOT AGREE Not Proven _____
(Murder of Fred Salerno)

4. As to Racketeering Act Four Proven _____ CANNOT AGREE Not Proven _____
(Murder of John "Keys" Simone)

5. As to Racketeering Act Five Proven _____ CANNOT AGREE Not Proven _____
(Murder of Frank Sindone)

6a. As to Racketeering Act Six Proven _____ Not Proven __X__
(Conspiracy to murder Frank "Chickie" Narducci and Rocco "Rocky" Marinucci)

6b. (Murder of Frank "Chickie" Narducci) Proven _____ Not Proven __X__

7. As to Racketeering Act Seven Proven _____ · Not Proven __X__
(Murder of Rocco "Rocky" Marinucci)

8. As to Racketeering Act Eight Proven _____ Not Proven __X__
(Conspiracy to murder Enrico
"Eddie" Carini)

9. As to Racketeering Act Nine— Proven __X__ Not Proven _____
(Conspiracy to murder Peter Savino)

 A. If you found this racketeering act proven, beyond what date did that conspiracy continue?

Date <u>7–91</u>

10. As to Racketeering Act 10 Proven __X__ Not Proven _____
(Conspiracy to murder John Gotti)

 A. If you found this racketeering act proven, beyond what date did that conspiracy continue?

Date <u>1–88</u>

11. As to Racketeering Act 11 Proven __X__ Not Proven _____
(Labor payoff)

12. As to Racketeering Act 12 Proven __X__ Not Proven _____
(Labor payoff)

13. As to Racketeering Act 13 Proven __X__ Not Proven _____
(Labor payoff)

14. As to Racketeering Act 14 Proven ·X__ Not Proven _____
(Labor payoff)

15. As to Racketeering Act 15 Proven __X__ Not Proven _____
(Labor payoff)

16. As to Racketeering Act 16 Proven __X__ Not Proven _____
(Labor payoff)

17. As to Racketeering Act 17 Proven __X__ Not Proven _____
(Labor payoff)

18. As to Racketeering Act 18 Proven __X__ Not Proven _____
(Labor payoff)

19. As to Racketeering Act 19 Proven __X__ Not Proven _____
(Labor payoff)

20. As to Racketeering Act 20 Proven __X__ Not Proven _____
(Labor payoff)

21. As to Racketeering Act 21 Proven __X__ Not Proven _____
(Labor payoff)

22. As to Racketeering Act 22 Proven __X__ Not Proven _____
 (Labor payoff)

23. As to Racketeering Act 23 Proven __X__ Not Proven _____
 (Labor payoff)

24. As to Racketeering Act 24 Proven __X__ Not Proven _____
 (Labor payoff)

25. As to Racketeering Act 25 Proven __X__ Not Proven _____
 (Labor payoff)

26. As to Racketeering Act 26 Proven __X__ Not Proven _____
 (Labor payoff)

27. As to Racketeering Act 27 Proven __X__ Not Proven _____
 (Labor payoff)

28. As to Racketeering Act 28 Proven __X__ Not Proven _____
 (Labor payoff)

29. As to Racketeering Act 29 Proven __X__ Not Proven _____
 (Labor payoff)

30. As to Racketeering Act 30 Proven __X__ Not Proven _____
 (Labor payoff)

31. As to Racketeering Act 31 Proven __X__ Not Proven _____
 (Labor payoff)

32. As to Racketeering Act 32 Proven __X__ Not Proven _____
 (Labor payoff)

33. As to Racketeering Act 33 Proven __X__ Not Proven _____
 (Labor payoff)

34. As to Racketeering Act 34 Proven __X__ Not Proven _____
 (Labor payoff)

35. As to Racketeering Act 35 Proven __X__ Not Proven _____
 (Labor payoff)

36. As to Racketeering Act 36 Proven __X__ Not Proven _____
 (Labor payoff)

37. As to Racketeering Act 37 Proven __X__ Not Proven _____
 (Labor payoff)

38. As to Racketeering Act 38 Proven __X__ Not Proven _____

 (Labor payoff)
39. As to Racketeering Act 39 Proven __X__ Not Proven _____
 (Labor payoff)

40. As to Racketeering Act 40 Proven __X__ Not Proven _____
 (Labor payoff)

41. As to Racketeering Act 41 Proven X Not Proven _____
 (Extortion conspiracy)

 A. If you found this racketeering act proven, beyond what date did that conspiracy
 continue?

 Date 6–89

 AS TO COUNT TWO
 (Racketeering Conspiracy)

B. How do you find the defendant as to Count Two

 Guilty X Not Guilty _____

 B1. If you found defendant guilty, beyond what date did that conspiracy continue?

 Date 6–93

 AS TO COUNT THREE
 (Conspiracy to Murder Peter Savino)

C. How do you find the defendant as to Count Three

 Guilty X Not Guilty _____

 C1. If you found defendant guilty, beyond what date did that conspiracy continue?

 Date 7–91

 AS TO COUNT FOUR
 (Conspiracy to Murder John Gotti)

D. How do you find the defendant as to Count Four

 Guilty X Not Guilty _____

 D1. If you found defendant guilty, beyond what date did that conspiracy continue?

 Date 1–88

 AS TO COUNT FIVE
 (Extortion Conspiracy—Windows Industry)

E. How do you find the defendant as to Count Five

 Guilty X Not Guilty _____

 E1. If you found defendant guilty, beyond what date did that conspiracy continue?

 Date 6–89

 AS TO COUNT SIX
 (Labor Payoff Conspiracy)

F. How do you find the defendant as to Count Six

Guilty _____ Not Guilty _____

F1. If you found defendant guilty, beyond what date did that conspiracy continue?

Date 6–88